**SECURITIES AND EXCHANGE COMMISSION v. FOUNDATION PLAN, Inc., et al.**

District Court, S. D. New York.
Dec. 19, 1939.

332

Chester T. Lane, Gen. Counsel, John H. Kelley, Asst. Gen. Counsel, Securities and Exchange Commission, both of Washington, D. C., and John J. Dowling, of New York City, for plaintiff.

Franchot & Schachtel, of New York City (Kenneth Simpson, of New York City, of counsel), for defendants Foundation Plan, Inc., H. C. Williams, and Robert B. Deans.

R. R. McGee, of New York City, for defendant James Connor.

Jerry Scott, pro se.

W. J. Dawley, of New York City, for defendant Benjamin Blumenthal.

Harry G. Herman, of New York City, for defendant Kirk C. Tuttle.

LEIBELL, District Judge.

The plaintiff is a Commission of the United States, organized and existing under and by virtue of the Act of Congress approved June 6, 1934, entitled the "Securities Exchange Act of 1934", 15 U.S.C.A. § 78d.

This suit is brought under the provisions of the Securities Act of 1933, and particularly of Section 20(b) thereof, 15 U.S.C.A. § 77t (b), jurisdiction is conferred on this Court by Section 22(a) of the Securities Act of 1933, 15 U.S.C.A. § 77v (a).

The defendant, Foundation Plan, Incorporated, was until on or about May 31, 1938, known as United Endowment Foundation, Inc., and has since July, 1932, issued and sold, was until after the institution of this suit issuing and selling, and is now issuing and selling, to members of the public residing in the states of New York, Connecticut, Massachusetts, Pennsylvania, South Carolina, Florida, Louisiana, Texas, Michigan, and elsewhere, securities, namely Periodic Payment Investment Contracts, referred to and distributed by the defendant corporation as "Periodic Plan Certificates", with or without insurance, and single deposit investment contracts, referred to by the defendant corporation and distributed as "Paid-Up Plan Certificates", together with trust shares known as Foundation Trust Shares, Series A. Periodic Payment Plan Certificates were during the time set forth in the complaint sometimes referred to by the defendant corporation, its representatives and salesmen as "Endowment Certificates", "Monthly Payment Plans", "Periodic Payment Certificates", and similar designations, and Paid-Up Plan Certificates are sometimes referred to as "Paid-Up Endowment Certificates", "Paid-Up Plans", and "Paid-Up Certificates."

Defendant corporation maintains executive and sales offices in the City of New York, State of New York, which is also its main office and executive office, and is represented in various large cities in various states of the United States by persons variously referred to as state managers, district managers, as well as by salesmen numbering from time to time during the period set forth in plaintiff's complaint from 75 to 200 in number. Among the cities in which sales managers, state managers and district managers were located are: Syracuse, N. Y., Buffalo, N. Y., Utica, N. Y., Rochester, N. Y., New York, N. Y., Philadelphia, Pa., Bethlehem, Pa., Pittsburgh, Pa., New Haven, Conn., Boston, Mass., Providence, R. I., Shreveport, La., Atlanta, Ga., Miami, Fla., Charleston, S. C., and Baltimore, Md., and the remuneration of said salesmen and its managers was and is exclusively dependent upon commissions or overriding commissions derived from the sale of such certificates. The defendants H. C. Williams and Kirk C. Tuttle, in addition to their salaries, received an overriding commission on all sales, while the entire income of the defend-

ant Robert B. Deans was derived from and dependent upon overriding commissions on sales, together with the dividends he received by virtue of his ownership of over 65 per cent of the preferred stock. Robert B. Deans, in addition, holds approximately sixty-six per cent of the entire issue of common stock.

At the commencement of this action, Robert B. Deans held approximately one-third of the common stock. H. C. Williams, on July 9, 1938, and until December 20th, when Deans bought him out, owned 6 shares of preferred stock and 796 shares of common stock and was one of four voting trustees of 210 shares of common stock with Deans and two other individuals.

At all times after on or about July, 1932, until on or about the last week of the year 1938, when he resigned and his resignation was accepted, the defendant H. C. Williams, was president and a member of the Board of Directors of the defendant corporation; and at all times since on or about July, 1932, the defendant, Robert B. Deans, was and still is vice-president, treasurer and a member of the Board of Directors of the defendant corporation.

"Periodic Payment Plan Certificates" evidence a participation in a service or custodial agreement, referred to as a trust agreement, dated January 1, 1933, executed March 29, 1933, by and between the defendant corporation, as sponsor, and the Commercial National Bank & Trust Company, of New York, N. Y., as successor trustee, and any purchaser of a certificate issued under said agreement, which agreement was amended June 10, 1935, December 31, 1935, and June 8, 1938. The certificates issued under said agreement were in unit denominations of $1,200, providing for payment by each purchaser of $10 per month for a period of ten years. Payments are made to the trustee in amounts depending on the face amount of the certificate, which is customarily issued in the face amount of one unit or in additional multiples of half units. Said certificates may be issued "with insurance", in which instances premiums for said insurance are deducted from instalment payments, and the insurer, under the terms of a group insurance policy undertakes to pay the trustee in one lump sum the periodic payments remaining unpaid at the time of subscriber's death. The sum so to be paid by the insurer ranges downward from $1,190 to $10. "Paid-Up Plan Certificates"' are is-

sued in denominations of $500 or larger amounts in multiples of $100.

On "Periodic Plan Certificates" sold prior to July 15, 1938, there was charged or imposed by the terms of the service or custodial agreement, referred to as a trust agreement, dated January 1, 1933, a creation or service fee of 7½ per cent of the total amount of payments contemplated under the certificate to be paid in during its entire life, being equal to $90 under a $10 per month certificate. On such plan, all of the first six payments, and half of the next six, are retained by the defendant corporation to pay this fee. Additional deductions are made from payments on plans carrying insurance. Since July 15, 1938, the creation or service fee of $90 on a $10 a month certificate is deducted by the defendant corporation at the rate of $48 from the first six payments, $36 from the next six payments, and $6 from the next six payments. Slight reductions in the service or creation fee are made where the monthly payments made by the subscriber are substantially larger than $10, reaching a minimum of 5½ per cent where the subscriber contracts for and pays monthly payments of $150 or more.

While there is no creation or service fee deducted from the initial payment for a fully paid certificate, there is a withdrawal charge of ⅛ of 1 per cent of the amount deposited for each six months' period, or fraction thereof, remaining between the date of withdrawal and the expiration of the ten-year term.

Under the terms of the service or custodial agreement referred to as a trust agreement dated January 1, 1933, any balance remaining after the deduction of the service or creation fee, and insurance premium in appropriate cases, is used to acquire for the account of the certificate holder shares in an investment trust known as "Foundation Trust Shares, Series A". These shares are subject to a lien for any unpaid part of the creation fee or service charge of the defendant corporation.

Foundation Trust Shares, Series A, are shares of an investment trust of the same name, of the unit type created by defendant corporation under a trust indenture dated January 1, 1932, executed May 4, 1932, amended July 7, 1932. The Commercial National Bank & Trust Company acts as trustee. Each share represents a beneficial interest in ⅟₁₀₀₀th part of a "trust unit", which unit consists of shares of common stock of

29 corporations, which are deposited with the trustee.

The offering price of such trust shares is based on and varies with the current odd-lot prices of deposited underlying stocks in each unit, plus brokers' commissions, the result being divided by 1,000 to obtain the basic cost of one share. To this basic cost is added: (a) 8.108 per cent of such basic cost, amounting to a load or mark-up equalling $7\frac{1}{2}$ per cent of the selling or offering price; (b) cost of original issue and transfer taxes; and (c) accumulations resulting from dividends or disbursements on the underlying securities.

When the foregoing computation results in a figure not ending in a multiple of five cents, the selling or offering price of each trust share is marked up to the next highest $\frac{1}{20}$th of a dollar. This breakage inures to the benefit of the defendant corporation.

The load or mark-up of $7\frac{1}{2}$ per cent of the offering price for trust shares is distributed as follows: The trustee bank receives approximately 2 per cent of said trust share price, and the balance of $5\frac{1}{2}$ per cent is paid or credited to the defendant corporation.

The existence of the two agreements, both referred to as trust indentures, dated respectively January 1, 1933, and January 1, 1932, results in a complicated series of transactions and bookkeeping entries with and respecting the moneys paid by purchasers of "Periodic Payment Plan Certificates", accompanied by two separate sets of fees and charges that are deducted from said moneys. Each set of fees and charges equals approximately $7\frac{1}{2}$ per cent of the total moneys paid in by the purchaser of the Periodic Payment Plan, and in some circumstances lend themselves to confusion and to the mistaken notion that only one set of fees and charges in fact exists.

The defendant corporation during some of the time set forth in plaintiff's complaint maintained a "bid" price for trust shares which was 6 per cent below the selling or "asked" price, though not legally bound so to do. Such market resulting from the maintenance of this bid by the defendant corporation in the over-the-counter market was a nominal or sponsored market.

During the period set forth in plaintiff's complaint, the defendant Foundation Plan, Incorporated, for itself and for its wholly-owned subsidiary, Foundation Plan, Inc., which subsidiary had at all times the same principal officers and management as the defendant corporation, and the assets and liabilities of which were assumed by the defendant corporation on or about August 1, 1938, and who sold plans identical in terms, with identical fees and deductions as its parent, the defendant corporation, sold a total of more than $17,000,000 in face amount of certificates or plans, of which more than $12,000,000 was in monthly payment certificates without insurance, and more than $4,000,000 in monthly payment certificates with insurance, and more than $1,000,000 in fully-paid certificates.

The holders of said "Periodic Payment Certificates" will under the terms thereof continue to pay their periodic cash payments, which after deductions of fees and charges will be used to purchase Foundation Trust Shares, Series A, for the account of such holders, and the holders of fully-paid certificates will continue to be subject to withdrawal fees in the event of liquidation prior to the termination of the ten-year term of such certificates.

From on or about July 7, 1933, the securities, namely, certificates, endowment certificates, or plans of the defendant corporation and Foundation Trust Shares, Series A, were registered with the Securities and Exchange Commission, plaintiff, pursuant to the provisions of Section 6 of the Securities Act of 1933, 15 U.S.C.A. § 77f, and the corporate defendant prepared and filed as part of said registration statement a prospectus provided for under Section 10 of the Securities Act of 1933, 15 U.S.C.A. § 77j, which prospectus was from time to time thereafter amended and revised.

The defendant Connor, after the commencement of this trial, at the conclusion of plaintiff's case, on December 8th, 1938, through his attorney R. R. McGee, consented in open court to the making and entry of a decree against him, as prayed for in plaintiff's bill of complaint.

Between May, 1937, and the time of the institution of this action the defendants Foundation Plan, Incorporated, H. C. Williams, Robert B. Deans, and Benjamin Blumenthal, directly and indirectly, caused to be carried through the mails and in interstate commerce securities, namely, certificates, endowment certificates and plans, for the purpose of sale and for delivery after sale, without their being accompanied or preceded by an official prospectus complying with Section 10 of the Securities Act of 1933, as required by Section 5(b) (2) of said Act, 15 U.S.C.A. § 77e (b) (2). The mails were used by the defendant corporation at the

instance of the defendant Blumenthal, who cooperated in causing the mails to be used for the purpose of delivering said certificates or plans from the office of the company in New York, N. Y., to certain of the customers of Blumenthal who resided in the State of Massachusetts between May, 1937, and August, 1938. The mails were used at the instance of other salesmen or representatives not parties to this action for the purpose of delivering said certificates or plans from the office of the company in New York, N. Y., to certain persons residing in the State of New Jersey in the months of June, 1937, and February, 1938, and, similarly, for the purpose of delivering securities to a purchaser in the State of Pennsylvania, without such prospectus accompanying or preceding said security in the month of August, 1937.

The defendant Williams, as president of the defendant corporation, in the course of his duties as chief executive thereof, instructed the state manager for the State of Pennsylvania to emulate the defendant Connor in suppressing or holding back the use of a prospectus by stating to him that Connor's sole sales kit consisted of an application blank.

The defendant corporation and its officers, the defendants H. C. Williams, Robert B. Deans and Kirk C. Tuttle, took no steps to distribute or mail directly to purchasers the prospectus at the time the certificates, endowment certificates, or plans were caused by said defendant corporation and its officers to be mailed to various purchasers by the trustee, Commercial National Bank & Trust Company, until in or about the month of May, 1938, after the order for investigation had been issued by the plaintiff herein against the defendant.

The plaintiff started its investigation of the sales methods and activities employed by the defendants in the sale of certificates, plans and securities issued by the defendant corporation late in March, 1938, and issued a formal order for investigation authorizing the taking of testimony and the employment of subpoena power, which order was dated April 19, 1938.

The defendant corporation operated a device, scheme and artifice to defraud in connection with the sale of certificates, endowment certificates, or plans of the corporation, in that they set up and employed a practice to resell or reload persons who had already purchased or acquired said certificates, endowment certificates, or plans, with additional certificates or plans calling for larger payments and subject to substantially larger fees and charges, inducing such purchasers to surrender the certificates held by them, in which an equity or value had been built up and established, which equity or value, or a substantial part thereof, would be consumed immediately upon the issuance of the new certificate to meet the increased costs and charges.

As a part of this device and practice, the defendants represented to purchasers and plan holders that it was to their advantage to surrender certificates held by them, and that such persons would be credited with the full amount paid in as an initial deposit on the new certificate; and that the transfer would be accomplished without additional cost, without disclosing to the purchasers that all, or a substantial part, of their equity behind the old certificate would be consumed immediately by the larger service fee.

The defendants, further as a part of such device, scheme or artifice to defraud, represented to holders of certificates that the Commercial National Bank & Trust Company and the defendant corporation could no longer handle accounts for small sums economically, and that the purchaser should make larger payments, even though the same were not made monthly or regularly, whereas, in fact, the application or authority so obtained from the purchaser was made the basis for the issuance of certificates calling for greatly increased monthly payments, with correspondingly increased fees.

The defendant corporation and the defendants Scott and Tuttle, further as part of such device, scheme or artifice to defraud, set up a practice of notifying the salesmen in the field of those accounts which were anticipating or accelerating their payments, and were potential sources for the reloading practice.

The corporation, through its officers Robert B. Deans, Kirk C. Tuttle and H. C. Williams, had repeated notice of the fact that its sales representatives, particularly the defendants James Connor, Jerry Scott and Benjamin Blumenthal, were fraudulently failing to disclose to the reloaded certificate holders the extent of the new charges, or the manner in which they were deducted.

In many instances after complaint by certificate holders of misrepresentations by defendant's salesmen or their failure to state material facts on the sale of certificates, the

officers of defendant corporation, after investigation, directed that refunds be made or that the equities of certificate holders be restored.

The corporate defendant and its officers, Robert B. Deans, H. C. Williams and Kirk C. Tuttle, and other officers, further aided and abetted this device and scheme by mailing to the "reloaded" certificate holders letters and statements of account which with few exceptions failed to disclose the extinguishment of the equity built up by the certificate holders, through the imposition of additional fees and costs, and confused, misstated and misrepresented the status of the purchaser's new account with the company, and by mailing to him a deposit record card on which the corporation had entered as a deposit in terms of dollars the sum total of the previous deposits made by the certificate holders, and reaffirmed the same by inscribing on the new certificate issued after the reload the same figure, representing it to be the initial deposit to the credit of the certificate holder in this new account, without disclosing the fact that from this figure there had been deducted, in many cases to its total extinction, the entire new fees and charges attached to the larger certificate, and that subsequent deposits in most cases would also be subject to these new increased fees and charges. The defendant H. C. Williams rebuked George E. Elrod when he sent out a letter which was informative and easy of comprehension.

The corporation, through bulletins and circulars and printed instructions, mailed to its sales representatives throughout the country, advised and counselled and encouraged said salesmen to reload and resell, existing plan holders into larger plans, and held up in these circulars as examples to be emulated the defendants Jerry Scott, James Connor and Benjamin Blumenthal, who had concentrated on this practice of reloading. Said circulars respecting reloading were prepared and drafted by the defendant Jerry Scott and submitted to the defendants Kirk C. Tuttle, Robert B. Deans and H. C. Williams for editing and approval, and approved by them.

The defendant corporation dispatched defendant James J. Connor to different parts of the country to instruct sales representatives in the manner and technique of reloading present plan holders, and defendant H. C. Williams censured certain state managers who had compunction about this practice of reloading existing plan holders.

The defendants James Connor, Jerry Scott and Benjamin Blumenthal, and other representatives of the defendant corporation not parties to this action, in selling certificates, untruthfully stated the costs of the same and failed in many instances to make known to the purchaser the manner in which these costs were collected; represented to the certificate purchasers that the money they paid in was available at all times and might be withdrawn in full at any time; and misrepresented the position of the Commercial National Bank & Trust Company with relation to the plan in that they stated that the bank was sponsoring, in back of, and guaranteeing the plan, and that they were representatives of the bank and not employees of the defendant corporation.

The defendants James Connor, Jerry Scott and Benjamin Blumenthal, and other representatives of the defendant corporation, not parties to this action, untruthfully described the nature of the investment, representing it to have the security of bank deposits rather than making known the fact that it was in substance an investment in common stocks, and made emphatic statements as to the maturity value that was assured under these plans, omitting and failing to state that such maturity value depended upon the fluctuating market value of the underlying common stocks.

The defendant Benjamin Blumenthal represented that the moneys received from the purchasers of the defendant corporation's securities were loaned or advanced to the Commercial National Bank & Trust Company, which was obligated to repay the same in full.

The defendant corporation and the defendants, H. C. Williams, Robert B. Deans, Kirk C. Tuttle, and other of its executive officers, were repeatedly put on notice, both through complaints made in person and complaints received in writing, addressed to the corporation and to the Commercial National Bank & Trust Company, of the misrepresentations of the salesmen in the field respecting the plan, its costs and the manner of their deduction, and the failure of said salesmen to communicate to purchasers facts necessary to clarify the representations made by them and make them not misleading, and acquiesced in and tolerated these practices, and took no effective steps to stop said practices or terminate the employment of offending representatives.

The defendant corporation, through its sales bulletins, which at various times were

prepared by the defendants Jerry Scott and Kirk C. Tuttle, and edited and approved by the defendants H. C. Williams and Robert B. Deans, encouraged, counselled and advised the minimizing of the several sets of fees and charges attached to the purchase of these certificates, and counselled and advised sales representatives to compare this plan or security with a bank account, and to predict a definite and exaggerated maturity value respecting the same to prospective purchasers and customers and to rely on oral presentation and salesmanship rather than the required statutory prospectus.

The defendant corporation failed to control its agents and sales personnel in the sale of certificates, and the defendants H. C. Williams, Robert B. Deans, Kirk C. Tuttle and Jerry Scott acquiesced in, instructed and encouraged salesmen to sell such certificates by means of false representations and concealment, and to engage in the practice of reloading existing plan or certificate holders. The defendants Jerry Scott and Benjamin Blumenthal engaged in and effected many such transactions during the time set forth in plaintiff's complaint.

The defendants Jerry Scott and Benjamin Blumenthal falsely represented the capacity and function of the trustee bank, and falsely represented that Jerry Scott was an officer of said bank.

The defendants used and employed certain printed cards and paraphernalia, such as deposit record cards, and referred to payments as deposits when they had been absorbed for fees, and in other ways used confusing terms, such as "Endowment Certificates", "Consolidated Plans", and "the Company's Bank", and failed to state clearly to purchasers the status of their accounts and the various charges and deductions therefrom, and confused and mingled statements in terms of money value and share value interchangeably in such manner that the course of business operated as a fraud or deceit upon purchasers of said plans or certificates.

That on or about the 22nd day of July, 1936, the defendant Benjamin Blumenthal entered into a written contract (Ex. XXX) with the defendant, as a salesman of its securities.

That under the said contract of employment between the defendant corporation and the defendant Blumenthal, the latter was paid the sum of $25 and no more upon each sale by him of a $1,200 unit or plan of either the aforesaid Periodic or Paid-Up Plan, and a commission of $3.75 on each $100 of subscriptions for Foundation Trust Shares, Series A. Said contract continued in effect until on or about the 15th day of October, 1936.

That on or about the 15th day of October, 1936, the defendant Blumenthal entered into a second written contract (Ex. YYY) with the defendant corporation, whereby the aforesaid contract of July 22, 1936, was abrogated, and the defendant was thereby given a field manager's contract for Springfield, Massachusetts, and vicinity, whereunder his commission on the sale of each of the aforesaid types of plan was fixed at the sum of $30 for each $1,200 plan sold by him, and his commission on the sale of said Foundation Trust Shares remained the same as hereinbefore stated. Said field manager's contract remained in effect until on or about the 27th day of February, 1937.

That on or about the 27th day of February, 1937, the aforesaid contract of October 15, 1936, was, by written communication (Ex. YYY) addressed to said defendant, changed into a contract whereby "in each instance the commissions to prevail will be on the basis of a District Manager." Said contract went into effect on March 1, 1937, and from that date until the termination of defendant's service with defendant corporation the commission paid to defendant was the sum of $35 per unit or plan of $1,200 sold by defendant, and his commissions on the sale of Foundation Trust Shares remained the same as aforesaid.

That under said last-mentioned contract defendant continued as a salesman for the defendant corporation until on or about the 12th day of September, 1938, when he was suspended. On October 4th he received a 30-day notice terminating his employment as of November 3, 1938.

That from the beginning of defendant's employment by said corporation to September 12, 1938, defendant was paid by said corporation for all commissions of every nature and kind earned by him the total sum of $9,717.34.

That defendant Blumenthal employed no salesmen and operated in conjunction with no other salesmen of the defendant, except in the two instances hereinafter referred to in connection with the defendant Jerry Scott, and in the three instances hereinafter referred to in connection with the defendant James Connor.

That defendant Blumenthal was a licensed salesman of securities in the State of Mas-

338

sachusetts, and all the sales of securities made by defendant Blumenthal for the defendant corporation were made in the State of Massachusetts.

That in making sales and traveling through his territory in the State of Massachusetts for that purpose the defendant Blumenthal employed his own automobile and paid his own expenses for its upkeep, repair, oil and gas therefor, as well paid his own expenses for meals, lodging and entertainment, which expenses averaged between $20 and $25 per week.

That at the close of business for the year 1938, the defendant Blumenthal was charged on the books of the defendant corporation with the sum of approximately $2,500, the same being a debt to the corporation, which sum if deducted from the aforesaid sum of $9,717.34 would make the defendant's net earnings for the entire period of his employment by the defendant the sum of approximately $7,200; said charges against him represented charge backs where accounts had been refunded upon which he had been paid a commission.

That during the period of defendant's employment by the defendant as a salesman as aforesaid defendant Blumenthal sold between 210 and 220 individuals, all of which sales were made by him individually, except two sales where defendant Scott assisted, and three sales where the defendant Connor assisted.

That out of said total number of sales defendant Blumenthal made resales, that is, sales of additional units of $1,200 or more, each, to approximately seven of his former subscribers or customers, and in the case of such resales new certificates for such additional units were issued to the subscriber and his original certificate retained by him, or her, as the case may have been.

That out of said total number of sales (between 210 and 220) the defendant Blumenthal made fourteen resales for additional units, in which the subscriber was required to surrender to the defendant corporation the certificates held by him at the time and at the same time to sign an authorization to the trustee, the Commercial National Bank & Trust Company, to sell the Trust Shares then held by it for his account under the said certificates; in which cases the Trust Shares then to the subscriber's account under the certificates thus surrendered would be sold at the then market price thereof, from which total thus received by the trustee the transfer taxes and withdrawal fee

would be deducted, to which would be added as a credit to the subscriber the difference between the bid and asked price of the trust shares thus sold, the withdrawal fee previously deducted and the total amount of the service fees deducted previously on account of the certificates thus surrendered, and the total thus arrived at would be applied on the service fee of 7½ per cent upon the total of the application for the increased subscription, and the balance, if any, applied to the purchase of new trust shares under the new certificate or returned to the subscriber.

That the defendant Blumenthal made fourteen such reloads, individually, that is, personally and without assistance from other salesmen, as follows:—

One from one unit of $1,200 to a unit and one-half, viz., to a total of $1,800.

Eight from one unit of $1,200 to two units of a total of $2,400.

One from a total of $6,000 to a total of $8,400.

One from a total of $3,600 to a total of $7,200.

One from a total of $2,400 to a total of $4,800.

One from a total of $1,200 to a total of $6,000, which was later increased in conjunction with the defendant Connor to a total of $12,000 from said total of $6,000, the increase to the $6,000 figure having been made by the defendant Blumenthal, alone.

One from $2,400 to $6,000 by defendant Blumenthal, also alone.

That some of said subscribers were later reduced by arrangement with the defendant corporation to their original subscription amounts, and the defendant Blumenthal debited with the commissions paid him on the increases.

That the defendant Blumenthal made two "reloads" with the assistance of the defendant Scott, viz., (a) in the case of the Reverend Simard, from a total of $11,200 to a total of $24,000; which account of said subscriber was later closed by the defendant corporation returning and repaying to said subscriber all the moneys which he had paid on account of his several subscriptions, including said "reload", and the amount of the commissions paid to defendant Blumenthal on the said account was debited back against him on the books of the corporation and constitute a deduction from the aforesaid total of $9,717.34. That on the said reload the defendant Blumenthal paid no part of his

commission on the reload to the said defendant Scott. (b) In the case of one Stanislaus J. Wojtasiewicz, from a total of $7,000 to a total of $24,000, which account of said subscriber was later closed by the defendant corporation returning and repaying to said subscriber all the moneys which he had paid on account of his several subscriptions, including said "reload" and the amount of the commissions paid to defendant Blumenthal on said account were debited back against him on the books of the corporation and constitute a deduction from the said total of $9,717.34. That on the said "reload" the defendant Blumenthal paid no part of his commission on the reload to the defendant Scott.

That the defendant Blumenthal made three "reloads" with the assistance of the defendant Connor, to wit:—(a) One in the case of Dr. Bernier, from $6,000 to $12,000; (b) one in the case of the Reverend Jablonski, from $1,800 to $3,600; and one in the case of Reverend Rozewicz, from $1,200 to $3,000, which last-named subscriber was later restored to his original $1,200 account.

That in said three cases the defendant Connor was paid by the defendant Blumenthal one-half of defendant Blumenthal's commission on the increased amounts.

That the defendant Blumenthal acted solely as a salesman aforesaid; had no executive or other position of authority with the defendant corporation; had nothing to do with the preparation of various documents organizing the same or issued after its organization, at any time, or anything to do with the preparation of any of the literature issued by the corporation and supplied to himself and the other salesman; except in the five instances of reload above specified, the defendant Blumenthal acted singly and alone, and solely for himself.

That the defendant, Kirk C. Tuttle, was employed by the defendant corporation in the spring of 1934 to do statistical and analytical work, to answer correspondence and prepare various pieces of literature for said corporation under the supervision and direction of the defendant, Harry C. Williams, and in his absence, Robert B. Deans, respectively president and vice-president of the said corporation, during the period of said employment.

That the defendant, Kirk C. Tuttle, was elected secretary of the said defendant corporation in May, 1935, and continued to do statistical and analytical work, to answer correspondence and prepare various pieces of literature for said corporation under the supervision and direction of the defendant, Harry C. Williams, and in his absence, Robert B. Deans, respectively president and vice-president of the said corporation, during the period of said employment.

That the defendant, Kirk C. Tuttle, was at no time a director or stockholder of the said defendant corporation.

That the defendant, Kirk C. Tuttle, at no time ever had the authority or power to discharge the defendants, James Connor, Jerry Scott, or Benjamin Blumenthal.

That in the course of the duties of the defendant, Kirk C. Tuttle, all letters of complaint received by him for and on behalf of the corporation were, after investigation by him, referred for disposition to the defendant, Harry C. Williams, president of the defendant corporation, or in his absence, to the defendant, Robert B. Deans, vice-president of the said defendant corporation. Kirk C. Tuttle interviewed and wrote to complainants and corresponded with salesmen in relation to the complaints.

That the defendant, Kirk C. Tuttle, at no time had the power or authority, except under instructions from the aforesaid defendants, Harry C. Williams, or Robert B. Deans, to pay out any monies of the defendant corporation to any of its subscribers or customers.

That the defendant, Kirk C. Tuttle, at no time had the power or authority, except under instructions from the aforesaid Harry C. Williams or Robert B. Deans to reinstate any subscribers or customers to any plan or plans different from those which they already had.

This court has jurisdiction of the parties and subject matter of this suit.

By reason of the aforesaid acts and practices, the defendants Foundation Plan, Incorporated, H. C. Williams, Robert B. Deans, James Connor, Jerry Scott, Benjamin Blumenthal and Kirk C. Tuttle did, during the time set forth in plaintiff's complaint, directly and indirectly carry and cause to be carried through the mails and in interstate commerce, the certificates, plans and securities issued by Foundation Plan, Incorporated, and registered pursuant to the Securities Act of 1933, for the purpose of sale and delivery after sale, without their being accompanied or preceded by an official prospectus, as required by Section 5(b) (2) of said Act, 15 U.S.C.A. § 77e(b) (2).

From August 1, 1936, down to the date of the commencement of this action,

the defendants Foundation Plan, Incorporated, H. C. Williams, Robert B. Deans, James Connor, Jerry Scott, Benjamin Blumenthal and Kirk C. Tuttle, in the sale of its certificates, plans and securities, by the use of means and instruments of transportation and communication in interstate commerce, and by the use of the mails, employed a device, scheme or artifice to defraud the purchasers of said securities by directly and indirectly reloading or reselling to said purchasers, by fraudulent means, additional certificates or plans calling for larger payments and subject to larger deductions for fees and charges, in the course of which transactions the defendants induced the purchasers to surrender certificates held by them in which they enjoyed substantial equities, which equities were consumed in whole or in part by the increased fees and charges, in violation of Section 17(a) (1) of the Securities Act of 1933, 15 U.S.C.A. § 77q (a) (1).

 From August 1, 1936, down to the date of the commencement of this action, the defendants Foundation Plan, Incorporated, H. C. Williams, Robert B. Deans, James Connor, Jerry Scott, Benjamin Blumenthal and Kirk C. Tuttle, in the sale of its certificates, plans and securities, by the use of means and instruments of transportation and communication in interstate commerce, and by the use of the mails, directly and indirectly obtained money and property by means of untrue statements of material facts, and omissions to state material facts, necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in violation of Section 17(a) (2) of the Securities Act of 1933, 15 U.S.C.A. § 77q (a) (2).

From August 1, 1936, down to the date of the commencement of this action, the defendants Foundation Plan, Incorporated, H. C. Williams, Robert B. Deans, James Connor, Jerry Scott, Benjamin Blumenthal and Kirk C. Tuttle, in the sale of its certificates, plans and securities, by the use of means and instruments of transportation and communication in interstate commerce, and by the use of the mails, directly and indirectly engaged in transactions, practices and courses of business which operated, would and did operate, as a fraud and deceit upon the purchasers of said securities, in violation of Section 17(a) (3) of the Securities Act of 1933, 15 U.S.C.A. § 77q (a) (3).

The defendants Foundation Plan, Incorporated, H. C. Williams, Robert B. Deans, James Connor, Jerry Scott, Benjamin Blumenthal and Kirk C. Tuttle, their agents, servants, representatives and employees, and all others acting by or under their direction or authority, and all other persons in concert or participating with them, should be perpetually enjoined and restrained from violating the provisions of Sections 5(b) (2) and 17(a) (1), (2) and (3) of the Securities Act of 1933, 15 U.S.C.A. §§ 77e (b) (2) and 77q (a) (1), (2) and (3), in accordance with the prayer of the bill of complaint.

Plaintiff is entitled to have final judgment for the injunctive relief mentioned.