**PERGAMENT et al. v. FRAZER et al.**
**Civ. A. No. 7354.**

United States District Court
E. D. Michigan, S. D.
Aug. 11, 1950.

Samuel L. Chess, New York City, Perlman, Goodman, Hecht & Chesler, Chicago, Ill., and Fischer & Fischer, Detroit, Mich., for proponents-plaintiffs.

Willkie, Owen, Farr, Gallagher & Walton, New York City, and Butzel, Eaman, Long, Gust & Kennedy, Detroit, Mich., of counsel for proponents-defendants.

George E. Brand and George E. Brand, Jr., Detroit, Mich., and Gordon Johnson, San Francisco, Cal., for defendant Kaiser Aluminum & Chemical Corporation, formerly the Permanente Metals Corporation.

Simpson, Thacher & Bartlett, New York City, for defendant Graham Paige Motors Corporation.

Garey & Garey, New York City, for defendant Joseph W. Frazer.

Miller & Hornbeck, Cleveland, Ohio, and Clair John Killoran, Wilmington, Del., for objecting stockholder, Otis & Co.

Lewis M. Dabney, Jr., Anderson & Carew, and Gale, Bernays, Falk & Eisner, New York City, for objecting stockholder Michael Stella.

Clair J. Killoran, Wilmington, Del., Samuel Marion, New York City, and Ernest P. LaJoie, Detroit, Mich., for objecting stockholder Eva Lefker.

Lemuel B. Schofield, Marvin Comisky, G. Fred DiBona, Philadelphia, Pa., and David V. Martin, Detroit, Mich., for objecting stockholder James F. Masterson.

Griffiths, Williams & Griffiths and Marcus, Kelman & Loria, Detroit, Mich., Norman Amenberg and Held, Rawick & Schnur, New York City, for other objecting stockholders.

Mortimer Shapiro, New York City, for Graham Paige Bondholders Protective Committee.

advisable to set forth chronologically certain facts concerning the several stockholders' derivative actions affected by our decision of the main question before this court.

On February 9, 1948, James F. Masterson of Philadelphia, Pa., started a stockholders' derivative suit in the Circuit Court for Wayne County, Michigan, against Kaiser-Frazer Corporation and Otis & Co., et al., including certain of their officers and directors. Otis & Co. was made a defendant because plaintiff sought to enjoin carrying out of a proposed sale of 1,500,000 shares of Kaiser-Frazer stock that Otis & Co. was supposed to take over that very day. Plaintiff also sought an accounting from certain defendants. The case was removed to this court May 21, 1948 and the complaint was twice amended to cover many of the same issues set forth in the other actions.

Mr. Masterson owns 300 shares of Kaiser-Frazer stock.

On February 13, 1948, Kaiser-Frazer Corporation commenced suit against Otis & Co. in the Southern District of New York, seeking damages based on the alleged breach of contract by Otis & Co. in refusing to fulfill the above agreement.

On May 10, 1948 Michael Stella began a stockholders' derivative suit in New York against Kaiser-Frazer Corporation and its directors and officers charging illegal manipulation of its stock. Stella owns 20 shares of Kaiser-Frazer.

May 14, 1948, the Pergament and London action was started in this court against Kaiser-Frazer, et al. Originally it involved only the Graham-Paige and stabilization features, but was later amended to include the Trentwood plant (Permanente) and other transactions. Pregament has 300 shares and Dr. London 8 shares.

June 30, 1948 Eva Lefker (25 shares) began a stockholders' derivative suit against Kaiser-Frazer, et al., including officers and directors, in a Delaware U. S. District Court, based chiefly on transfer of the letter of intent by Kaiser-Frazer to Permanente covering the Trentwood, Washington, aluminum plant.

July 2, 1948 Otis & Co a Cleveland brokerage house, started a similar action in Delaware against Kaiser-Frazer Corporation and certain officers and directors thereof. Otis & Co. owns or controls 10,763 shares of Kaiser-Frazer stock.

Another suit was started against most of these defendants July 9, 1948 in the state court of California by Hazel C. Fleming, who held 40 shares (amended August 6, 1948 to include Joseph W. Piantanida who owns 80 shares). It attacked the stabilization and Permanente transactions.

All suits, in general, charge breach of trust, fraud, collusion, etc., against these defendants.

On or about September 21, or 25, 1949, Pergament and London, plaintiffs in this action, began conferences with defendants through their attorneys, having as their objective settlement of this and all derivative suits begun by stockholders. A settlement agreement was arrived at October 25, 1949.

That proposed compromise is now before this court and if approved will serve to dismiss not only the Pergament-London action but will eliminate all other stockholders' derivative suits heretofore started. It does not affect the Kaiser-Frazer Corp. v. Otis & Co. suit in New York. 8 F.R.D. 364.

### Notices to Stockholders.

The first question presented relates to the sufficiency, legality and fairness of the notices sent to stockholders of Kaiser-Frazer informing them of the hearings on the proposed settlement agreement and the requested approval thereof by this court under Rule 23 (c) of the Rules of Civil Procedure for the District Court of the United States, 28 U.S.C.A.

The notice was in the form of an order to show cause why the agreed settlement should not be approved, and set forth in better than general terms conditions of the agreement. The hearing was fixed by this court for the 6th day of December, 1949 at ten o'clock in the forenoon.

The order was signed by us November 9, 1949 and the two weeks between De-

cember 6th and December 20th were devoted chiefly to clarifying the issues and recording opening statements of the several parties present. The hearing was then adjourned to January 17, 1950 at ten o'clock in the forenoon.

Because of the contentions, both factual and legal, advanced by those who appeared on behalf of certain stockholders objecting to the proposed settlement and who urged that the original notice of November 9, 1949 was misleading, untrue and legally ineffective, this court sought consent of all parties to the wording of a new notice aimed at eliminating claimed error in the original.

During those two weeks of argument this court also considered the advisibility of appointing counsel of its own but after having had an opportunity to evaluate the opposition, as demonstrated by counsel for objecting stockholders Lefker, Stella, Masterson and Otis & Co., this court was convinced that any and all pertinent facts that could possibly be ferreted out, and all possible reasons legal or factual, pro and con, that could eventually be placed before this or any court, would be available to us. We were certain that the interests of the stockholders would not be jeopardized nor the battle lost "for want of a horseshoe nail".

In short the court was completely satisfied that any objections that might be advanced against the advisibility of approving this agreement would have a complete airing since the very talented battery of attorneys for objecting stockholders proved to us early in the hearings that they were able, resourceful, efficient, experienced and devoted to their clients' respective claims, to such an extent as to be almost enthusiastically hostile to any person or thing that might at any time have come under the influence of Henry Kaiser or any of the "Kaiser Empire".

As for proponents, they had also secured counsel of equal ability and integrity.

No testimony was taken during the December hearings and by December 20, 1949 our efforts to have all parties join in an amended notice to the stockholders had failed. In fact, it appeared to this court that certain objecting stockholders, through their counsel, were satisfied and anxious to prevent curing of any error there might have been in the original notice.

However, over their objection but having in mind the object of Rule 23(c) we prepared a new notice and caused the same to be sent to all stockholders of defendant Kaiser-Frazer. We did not by such action intend to imply that any second notice was necessary or that there existed any defect or error in the original information given stockholders on the order to show cause. It was simply our intention to clarify what the objecting stockholders had criticized, to-wit, that the original notice was inadequate, unfair, fraudulent, misleading and had lulled stockholders into a feeling of security by asserting that the agreement covered certain considerations which objecting stockholders maintained it did not. Mullane, Special Guardian v. Central Hanover Bank & Trust Co., Trustee, 339 U.S. 306, 70 S.Ct. 652; In re Hansen's Guardianship, 229 Iowa 914, 295 N.W. 429.

■ The court believes that not only was the original notice ample, complete, sufficient and fair, but that if there was any defect or error in that notice it was cured through the second notice wherein the stockholders were informed by overemphasis on the matters challenged by the objectors.

Validity of Conferences, etc.,
by Which the Settlement
Agreement Was Reached.

Another issue which we must necessarily settle before proceeding is objecting stockholders' contention that the proposed settlement agreement should not be approved because, first, it is not the valid act of Kaiser-Frazer or anybody competent to act for Kaiser-Frazer; second, it was not arrived at by arms-length bargaining in good faith; third, failure to include attorneys for objecting stockholders; and, fourth, there was collusion.

This agreement is the result of several conferences between attorneys for certain plaintiffs, Pergament, et al., and defendants, either personally or by their attor-

neys. Quite naturally we believe defendants were trying to get as favorable an agreement as they could. On the other hand the plaintiffs were trying to drive as good a bargain as they thought they could.

Therefore, in considering these objections we examined Rule 23(c) which provides for the approval by this court of any such agreement. It states: "A class action shall not be dismissed or compromised without the approval of the court."

A settlement is a compromise and in order to acquaint ourselves with details of the agreement and the scope of approval we began hearing arguments. This court was interested only in the stockholders of Kaiser-Frazer and in our opinion these several lawsuits were a big detriment to future progress of this company. Technicalities were not to be permitted to erase or delay a fair settlement if one had been reached. Further hearings on the merits were to begin the 17th day of January, 1950 and we instructed both sides that the intervening period should be utilized by the taking of depositions—this court going to the extent of compelling defendants to assure the presence of witnesses, who were seemingly under their control, for cross-examination.

The hearings reopened January 17, 1950 and we took testimony until the 10th day of March, compiling a record of over 7,000 pages.

It is well to note here that this court did not hew to the line on the strict rules governing the admission of evidence. We permitted objectors, and to a limited extent, proponents, to put in practically every bit of testimony they could find, some of which was technically inadmissible, chiefly because we felt that objecting stockholders might be at a disadvantage if we adhered too strictly to the rules of evidence.

Again, on March 10, after seven weeks of testimony, we adjourned the hearing to April 11, 1950 to permit the parties to take further depositions or even present further witnesses if they so desired.

From the length of time consumed, the number of witnesses and exhibits, the depositions and the size of the record, it must be axiomatic that if the knowledge of all the attorneys representing the stockholders could have been added together, previous to or after negotiating this agreement, it could not have equalled or approached the facts that are now before this court. Each attorney may have known his own case but today we are all more enlightened and as we understand the duty of this court, it is—quoting from Winkelman v. General Motors Corporation, D.C., 48 F.Supp. 490, 493, "To see that the compromise is fair and reasonable under the circumstances and that no collusion or fraud has been practiced in the consummation of the settlement."

Our concern now is the contract that is presented to us for approval in the light of the information we have at present, not what we might have had when the agreement was reached. On that basis, we decide this case.

Let us then make further inquiry.

To begin with, counsel for objecting stockholders placed great stress on the fact that they were excluded from participating in the conferences leading to the agreement.

Well—was that unexpected?

It always has been the contention of defendants that these suits were engineered and instigated by outside forces, not for the purpose of helping Kaiser-Frazer or its stockholders but for the sole purpose of embarrassing the Kaisers as much as they could, even if it meant downfall of the corporation. While we do not inquire into plaintiffs' motives in bringing their actions or whether they are the real parties in interest, Johnson et al. v. King-Richardson Co., 1 Cir., 36 F.2d 675, 67 A.L.R. 1465; Blum et al. v. Fleishhacker et al., D.C., 21 F.Supp. 527; Pollitz v. Wabash R. Co., 150 App.Div. 715, 135 N.Y.S. 789; Eshleman v. Keenan, 21 Del.Ch. 116, 181 A. 655, we may properly use the admitted facts to determine whether there existed a legitimate reason for the open ignoring of the parties and attorneys of the other stockholders' derivative suits. The Masterson suit, the evidence shows, was brought at ten o'clock in the morning of the very day

that Otis & Co. allegedly reneged on its stock sale agreement with Kaiser-Frazer. In fact it was Otis & Co.'s reason for not going on with its purchase. In addition, there was open association and exchange of information and legal conclusions by their respective counsel, one of whom was the attorney for two of the objecting stockholders including Otis & Co., which is defendant in the Kaiser-Frazer v. Otis suit. All of this obviously created more than an "air of suspicion" about these stockholders' suits and much of the evidence tended to at least indicate that there might be some understanding or connection between Otis & Co. and the other objectors, more specifically Masterson, a former attorney for Otis & Co., and Eva Lefker.

These facts do enter into the reasoning of defendants and why they desired to do business with Pergament attorneys alone excluding those whom they believed were hostile to them and not particularly friendly to the great majority of Kaiser-Frazer stockholders.

Furthermore, Henry Kaiser stated under oath that Mr. Eaton of Otis & Co. had at one time threatened a deluge of lawsuits following which testimony this court suggested that Mr. Eaton be brought in as a witness, or his deposition taken. Mr. Eaton has never denied—either as a witness in this court or by deposition—that he made this threat.

■ So if defendants, Kaiser-Frazer's directors and officers, and the Kaiser interests wanted to get these lawsuits out of the way, as evidence proved they did, certainly they would have been "babes in the woods" to have sought to negotiate with those who seemingly didn't want a settlement except one they could dictate and therein exact admissions from defendants that they had been guilty of every abuse of trust, fraud, collusion and concealment known to business or law. In fact all through these hearings before this court attorneys for objecting stockholders continually belittled the Kaisers and the Kaiser-Frazer automobile which, in a competitive market, will have trouble enough without entering the economic battle scarred beyond recognition. We see no merit to objecting stockholders' contention that they should have been consulted. Any intelligent group of defendants would have acted likewise.

■ There is claim also by objecting stockholders that attorneys for plaintiff (Pergament) were in collusion with defendants. We saw no evidence of any such collusion. In all cases after attorneys have arrived at an agreement and it is desired to protect the several parties, it is usual for them to collaborate and make certain that nothing has been overlooked. Plaintiffs' attorneys said that they thought they had driven a good bargain, utilizing to the extreme the knowledge that defendants, particularly the Kaisers, wanted all these lawsuits out of the way before going on the guaranties of the hoped for loan from RFC. It is no great wonder, and we don't believe subject to the charge of collusion, that when the several attorneys had arrived at this point it was insisted by defendants that amendments be made to plaintiffs' bill of complaint to include the other actions. Defendants would have settled on no other basis. They wanted—and rightly so—to put an end to what they then termed, these bickerings, snipings, and nuisance lawsuits that were interfering with the progress and success of the Kaiser-Frazer Corporation. And why shouldn't they?

Counsel for objecting stockholders also claim that in negotiating the settlement there was evidence that defendants and their counsel concealed very material facts that were developed at the hearings before the court. We can only say that that charge could be made in every lawsuit of this magnitude unless each particular action was tried to a conclusion before the settlement was reached. The important point is that this court—while not admitting that there was any such concealment—now has the facts.

Objecting stockholders also contend that there was no arms-length bargaining; that the Kaiser-Frazer attorneys only gave plaintiffs' counsel whatever facts they desired to give; that the proposed settlement was dominated by interests hostile to the stockholders and that the stockholders

were not adequately represented, citing many cases in support of their position.

May we not impress this observation, that if this were a plan that involved the setting aside of a transaction which had already been completely consummated and had been found tainted with collusion, fraud, etc., and not in the best interests of the corporation, there would be merit to the objectors' position. American United Mutual Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91; Twin-Lick Oil Co. v. Marbury, 91 U.S. 587, 23 L.Ed. 328; Strong v. Repide, 213 U.S. 419, 420, 29 S.Ct. 521, 53 L.Ed. 853; Roberts v. Michigan Trust Co., 273 Mich. 91, 262 N.W. 744; Baxter v. Union Industrial Trust & Savings Bank, 273 Mich. 642, 263 N.W. 762; Maas v. Lonstorf, 6 Cir., 194 F. 577.

In fact most of the cases cited by objecting stockholders are distinguishable from the present case in that they involved suits to recoup losses resulting from a past transaction where the parties participating therein were acting in a fiduciary, representative or dual capacity and their good faith was challenged. In those cases the transactions had been consummated without full disclosure of all material facts; fraud was present or the fiduciary had an interest in the transaction resulting in profit to himself.

█ That directors and controlling stockholders or groups of controlling stockholders have a fiduciary responsibility to other smaller stockholders is unquestioned. Pepper v. Litton, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281; Epstein v. U. S., 6 Cir., 174 F.2d 754; Wentz v. Scott, 6 Cir., 10 F.2d 426; Young Spring & Wire Corp. v. Falls, 307 Mich. 69, 11 N.W.2d 329; Mayflower Hotel Stockholders Protective Committee v. Mayflower Hotel Corp., 84 U.S.App.D.C. 275, 173 F.2d 416.

If they have not acted in good faith or fraudulently and are found to have been in collusion with others the courts will not hesitate to set aside contracts or agreements so made. But those are cases where the proposed settlements were not in futuro. The deed had been done.

However, some cases cited by the objectors are admittedly not in the above category. For example Feldman v. Pennroad Corporation, 3 Cir., 155 F.2d 733; Karasik v. Pacific Eastern Corporation, 21 Del.Ch. 81, 180 A. 604; Goodwin v. Castleton, 19 Wash.2d 748, 144 P.2d 725, 150 A.L.R. 859; Perrine v. Pennroad Corporation, Del.Sup., 47 A.2d 479; and Winkelman v. General Motors Corporation, supra. These cases are in point and are authority for the legal conclusion that if there's fraud, collusion or unfair dealings on the part of the directors of the corporation in arriving at the settlement the court will set it aside. We have no quarrel with those decisions.

█ But here we do not find any collusion, fraud, concealment or unfair dealing in arriving at the compromise and we hold there was "arms-length bargaining."

Incidentally, in those above cases the court also found that good faith had been exercised and then proceeded to approve the settlement as presented or on condition that certain changes be made.

In Piccard v. Sperry Corporation, D.C., 36 F.Supp. 1006, 1009, application to approve of a compromise was denied because all the necessary facts in the determination of the cause were not before the court at the time the court was asked for its approval. It said: "The test is what is in the best interests of the corporation."

And Cohen v. Young decided in this circuit, 127 F.2d 721, indicates that it is the duty of this court to consider all available evidence and, if the settlement in light of this evidence is in the best interest of the corporation, to approve the plan. And while counsel for some of the other objecting stockholders might have been better informed of their own particular suits than counsel for Pergament who negotiated the settlement, we are basing our opinion on the agreement as we see it today, having advantage of the combined wisdom of all the attorneys—with all the facts—not only the information of any group or individual back in September, 1949,—bearing in mind that in a compromise neither side expects to get what it might win if successful. Usu-

ally a compromise agreement is not a complete' victory for one side or the other.

## The Applicable Law.

It is for this court, therefore, to determine whether the terms and consideration of the proposed settlement agreement fairly approach the logical probabilities of returns on the several stockholders' derivative actions hereinbefore enumerated. But the court must, of course, first decide what law is applicable.

We do not follow the legal conclusions of objecting stockholders that all transactions between corporations having interlocking or common directorates or management are void because of a conclusive presumption of fraud, regardless of whether the transactions, when made, were fair or unfair. McKay v. Swenson, 232 Mich. 505, 205 N.W. 583; Patrons' Mutual Fire Ins. Co. of Michigan v. Holden, 245 Mich. 493, 222 N.W. 754; People ex rel. Plugger v. Township Board of Overyssel, 11 Mich. 222; Miner v. Belle Isle Ice Co. et al., 93 Mich. 97, 53 N.W. 218, 17 L.R.A. 412; Veeser v. Robinson Hotel Co., 275 Mich. 133, 266 N.W. 54.

Nor, on the other hand, do we accept defendants' contentions that where there is such an interlocking directorate and a transaction between the corporations is attacked, the burden is on the complaining stockholder to prove that the transaction is fraudulent. Buck v. Tuxedo Land Co., 109 Cal.App. 453, 293 P. 122; Pauly v. Pauly, 107 Cal. 8, 40 P. 29, 48 Am.St.Rep. 98; Ewen v. Peoria & E. Ry. Co., D.C., 78 F. Supp. 312; Spiegel v. Beacon Participations, 297 Mass. 398, 8 N.E.2d 895; Everett v. Phillips, 288 N.Y. 227, 43 N.E.2d 18; Helfman v. American Light & Traction Co., 121 N.J.Eq. 1, 187 A. 540.

■ But we do hold that where there exist common or interlocking directorates (as herein, between the several Kaiser corporations and Kaiser-Frazer) which have elected to do business with each other, and such contracts or exchanges are questioned by any stockholder, then the directors of the challenged corporation have the burden of proving that the transactions were fair, the result of good faith, and the exercise of their best business judgment.

■ Most or practically all of these contracts were made in Michigan and to some extent both sides quote Michigan law and each claims that the law and the decisions favor its particular side. It is apparently agreed that Michigan law governs. Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Guaranty Trust Co. of New York v. York, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231; Klaxton Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. And in the absence of any definitive Nevada law as to the obligations of a corporation's officers and directors, Michigan law will be followed and is covered by Michigan Act No. 327, P.L.1931, Sec. 13(5), Mich.Comp.Laws 1948, Sec. 450.13, Subd. 5, Mich.Stat.Ann. 21.13(5) which reads: "No contract of any corporation made with any director of such corporation or with a partnership or other group or association of which any such director shall be a member or with any other corporation of which such director may be a member or director and *no contract between corporations having common directors shall be invalid because of such respective facts alone.* When the validity of any such contract is questioned, the burden of proving the fairness to the contracting parties of any such contract shall be upon such director, partnership, other group or association, or corporation who shall be asserting the validity of such contract." (Emphasis ours.)

It is the contention of objecting stockholders that the above statute has been interpreted as limited to those cases where the corporation is represented by a quorum of disinterested directors or other independent officers or agents authorized to contract for it; that in those instances where the directors have transacted business with the corporation and disinterested directors have not passed on the transaction, it is void, citing Veeser v. Robinson Hotel Co., supra, and Patrons' Mutual Fire Ins. Co. of Michigan v. Holden, supra, which appear to be in point.

But other cases cited in objectors' briefs are not in point because they involve transactions between directors and officers with their own corporations. Such contracts are usually held to be not void but voidable at the election of the party attacking them.

The case at bar is one of interlocking directorates and the rule undoubtedly is that such transactions between corporations are voidable, but, fortunately for defendants, interpretation of the Michigan statute did not cease with the Veeser case, supra. In Wiseman v. United Dairies, Inc., 1949, 324 Mich. 473, 37 N.W.2d 174, 182, wherein the above statute was concerned, the court stated: "We conclude from all the testimony in this case that United acting through its directors, who were also directors of Belrose, purposely brought about a situation where Belrose was unable to protect itself against the demands of its creditors, to insure itself credit or to continue for itself the conduct of its business, all for the purpose on the part of United of acquiring the property of Belrose at forced sale figures and defrauding the creditors of Belrose. The directors of United could also lawfully act as directors of Belrose. *The burden is on the directors of Belrose to prove that they acted fairly in the interests of Belrose.*" (Emphasis ours.) •

■ It would thus appear that transactions between corporations having even identical boards of directors are sanctioned by the Michigan courts. See also Voight v. Remick, 260 Mich. 198, 244 N.W. 446; Stowe v. Fair Grounds Ass'n, 249 Mich. 107, 227 N.W. 702; Turner v. Calumet & Hecla Mining Co., 187 Mich. 238, 153 N.W. 718; and Aldine Manufacturing Co. v. Phillips, 129 Mich. 240, 88 N.W. 632. Here the burden under the Michigan law is on the defendants to prove the fairness of the contracts questioned, which entails good faith, good judgment, and an adequate consideration.

It is doubtful whether the Michigan courts would even recognize the principle of the Veeser case today in view of the Supreme Court's 1949 decision in Wiseman v. United Dairies, Inc., supra. See also Wiseman v. Musgrave, 309 Mich. 523, 16 N.W. 2d 60.

The rule of the Sixth Circuit Court of Appeals appears to be the same. Epstein v. U. S., supra; Wentz v. Scott, supra. Also see Caldwell v. Dean, 5 Cir., 10 F.2d 299; Irving Bank-Columbia Trust Co. v. Stoddard et al., 1 Cir., 292 F. 815; Geddes v. Anaconda Copper Mining Co. et al., 254 U.S. 590, 41 S.Ct. 209, 65 L.Ed. 425.

■ As to those cases where the directors are charged with acting negligently or in bad faith and the directors have no personal interest in the transaction, 19 C.J.S., Corporations, § 832, page 244 states: "The burden rests on a suing stockholder to prove his case generally, as by establishing claims of the officers' and directors' misconduct, mismanagement, waste, or receipt of excessive compensation * *." The burden of proof in the manipulation and Long Beach suits would then be on the objectors. See Nahikian v. Mattingly, 265 Mich. 128, 251 N.W. 421.

■ We also hold that we should apply the law and view the transactions in the light of the facts existing at that time; not what happened later. In other words, we do not believe that hindsight (which is usually better) should be a yardstick of measurement against good intentions or what then appeared to be honest business judgment. Guth v. Loft, Inc., 23 Del.Ch. 255, 5 A.2d 503; Irving Bank-Columbia Trust Co. v. Stoddard et al., supra; Cleveland-Cliffs Iron Co. v. Arctic Iron Co., 6 Cir., 261 F. 15; Caldwell v. Dean, supra.

And so having determined the law, we must take up each charge to learn whether or not plaintiffs in those cases have reasonable grounds for expecting that they would recover damages against these defendants or any of them, either in toto or of a sufficient amount so that the consideration provided in the agreement does not warrant our approval of the same.

In this opinion, we, of course, do not aim to decide the several suits, nor do we intend to recite herein all the facts or law in dispute. Our aim is merely to cover the main questions and briefly to summarize them for higher court review so that this

opinion can be held within some reasonable length. Doubtless appealing parties will be able to point out some fact omitted in some or all of these issues and claim much for the omission; but we must look at the over-all picture and reach a decision as to whether this proposed agreement should be approved even if there is a fair probability that there exists some merit to one or more of the claims of the suing stockholders.

We have considered each individual action, and our reasons for the findings of fact and some conclusions of law concerning each will be found in full in the appendix hereto attached and made a part of this opinion.

## On the Merits

Briefly, however, we state here that in our opinion there would in all probability be no recovery by the objecting stockholder plaintiffs in the following transactions: (a) the Trentwood; (b) Manipulation-Stabilization; (c) Kaiser Steel; (d) Kaiser Engineers; and (e) Long Beach-Rototiller.

There might be a recovery of a comparatively small amount on the stock transfer valuation part of the Graham-Paige exchange; also on the Muntz car deal from Joseph Frazer, and possibly a small additional sum from Fleetwings.

## The Consideration

This brings us to the final questions for this court to determine which are centered about the one word "consideration", i. e. just what is the consideration, if any, to be paid by defendants according to the proposed agreement and is it sufficient as a compromise to satisfy the probable value of these several stockholders' derivative suits?

It is the contention of objecting stockholders that all the Kaiser-Frazer Corporation really receives is the sum of $500,000; that this is grossly inadequate and for this reason should not be accepted; furthermore it is objectionable because even the $500,000 is to be paid by only one of the defendants.

On the other hand, proponents insist that in addition to the $500,000, the Henry J. Kaiser Company, and Kaiser Company, Inc., agree by this settlement to give the RFC a guaranty of $15,000,000 on a $44,400,000 loan by RFC to Kaiser-Frazer (of which $10,000,000 is a revolving fund to the Kaiser-Frazer Sales Corporation) and that these guaranteeing corporations are obliged to actually pledge $10,000,000 in collateral. The giving of these guaranties alone—proponents claim—is worth between $3,500,000 and $20,000,000 to Kaiser-Frazer.

In addition and as further consideration certain presses long since owned by Kaiser-Frazer and loaned to the Fleetwings plant at Bristol, Pa., would—according to this agreement—be purchased outright and paid for by Fleetwings at present book value, to-wit, $879,503.30.

Let us examine this point, removing ourselves as far as possible from the somewhat exaggerated claims of both parties.

This court is of the opinion that throughout this entire hearing too much emphasis was placed by the objecting stockholders on how the Kaiser interests would fare if this agreement were approved rather than considering and appraising whether the agreement helped the stockholders and was fair and reasonable to them. And we have been unable to find any rule in law or equity that requires that this court shall not approve a compromise agreement under Rule 23(c) unless by the terms of that compromise one of the parties thereto is financially annihilated.

So this court has attempted to evaluate the consideration.

In September of 1949 the Kaiser-Frazer financial situation was desperate.

Its plant was shut down.

Ten thousand men who had been employed were out of jobs.

The result of their efforts, financial and physical, of building a sales organization was fast disintegrating. The dealers were stocked with cars they couldn't sell because while you could trade in almost any car and be sure that you would get a new model of the same make you couldn't do

this with a Kaiser or a Frazer. They weren't being made.

There were no new model Kaiser-Frazer automobiles on the floors of the dealers.

The lush days were gone.

The big companies were now making automobiles and the "waiting lists" for automobiles were gradually disappearing.

Kaiser-Frazer needed money for new models, for new tools, dies, etc., because it was now beginning to face stiff competition.

And to get that money an attempt had been made in February of 1948 to sell 1,500,000 new shares of Kaiser-Frazer stock at $11.50 per share but that deal fell through, due, as claimed by defendants in this suit, to the wrongful action of Otis & Co., the same company that is interested in one of the stockholders' suits against these defendants and whose president, Cyrus Eaton, has allegedly sworn a vendetta against Henry Kaiser.

So as matters progressed in September and it appeared that an RFC loan was possible (providing certain guaranties by the Kaisers were forthcoming) defendants evidently decided that this would be the propitious moment to get rid of these several lawsuits which threatened Kaiser-Frazer's very existence. What appeared to be the final blow came when this court October 12, 1949, 93 F.Supp. 9 (written opinion filed) denied defendants' motion for dismissal of the Pergament action and ruled that this (the Pergament) suit must be tried.

It is not surprising that at this time also Mr. Henry Kaiser stated in no uncertain language that he would not attach his name, or give the backing of any company he controlled, on any guaranties to anybody unless these suits were settled and out of the way. This court once voiced the opinion that Mr. Kaiser might have gone on the guaranties anyway but the evidence shows that he said he would not and he might not have plunged a large part of his entire assets in protecting a company some of whose stockholders were seemingly trying to achieve his financial eclipse.

Accordingly, the conferences with the RFC and the conferences between attorneys for plaintiffs in this case and the defendants, were carried on at practically the same time covering almost the same period; but, although the RFC loan was successfully negotiated before the settlement agreement was signed, sealed and delivered, this fact stands out; no commitment and no guaranties were ever given by the Kaisers to the RFC until November 9, 1949, and this was after the settlement agreement had been signed by all parties, October 25, 1949.

Let us again revert to previous days.

On December 28, 1948, the Mellon and Giannini interests had extended credit to the Kaiser-Frazer Corporation to the extent of $20,000,000 on which the company had borrowed $16,000,000 but couldn't get the other $4,000,000 without "upping" its current assets position. It was a short term loan due in less than 16 months—but it was then already in default.

Now, the Kaiser interests had guaranteed that loan and had to maintain a net current asset position of $7,500,000 with the Kaiser-Frazer stock taken at market or cost, whichever was less, and the Permanente Metals stock at 50 per cent of the market.

There were other restrictions against the Kaisers.

Under the bank guaranties they could not sell any property in excess of $2,000,000 during the entire loan nor could they give any other guaranty, mortgage, pledge or hypothecate any other stock they owned. Furthermore the Henry J. Kaiser Company and Kaiser Company were restricted in the dividends they could issue while Kaiser Engineers couldn't declare any dividends at all.

That was a heavy stricture upon the Kaiser interests. No doubt of that. But the short loan was likewise a heavy stricture upon Kaiser-Frazer and there was this fact to be remembered, that Kaiser-Frazer at that time had plenty of assets to pay off its bank loan even if it were forced to do so by liquidation.

If Kaiser-Frazer had been driven to failure because it had no money to continue the fight then the Kaiser interests, accord-

ing to the record, would not have lost one cent by their bank guaranties because they were subrogated to the rights of the banks in the event of foreclosure. And, incidentally, the stockholders would have received very little, if anything. Not even objecting stockholders contend that Kaiser-Frazer should have been liquidated at that time.

Ignoring for the moment the other objections raised concerning the consideration and guaranties and holding ourselves strictly to the guaranties being presented to the court as an act in futuro, let us analyze what happens by the new guaranties.

Instead of a $16,000,000 indebtedness and liquidation Kaiser-Frazer now has a $44,400,000 debt—but it has money to proceed in the manufacture of its new automobiles. Admittedly it needed that money either by loan or sale of stock and so it is again rising to the challenge and instead of being obligated to pay off the entire $16,000,000 loan—then in default—(due in less than 16 months) the new loan is spread over a period of ten years, the first payment not to be made until July 1, 1951.

Kaiser-Frazer breathes again.

It has the possibility of new life because part of the loan, perhaps $18,000,000, was earmarked for experimental purposes, tools, etc., for the next new model—Michigan people know the importance of the ever-anticipated "new model".

And so Kaiser-Frazer again cleared the decks by using the first $12,000,000 of its loan from RFC, and $4,000,000 of its own to repay the bank loans.

In rebuttal the objecting stockholders point out that instead of the Kaiser interests being guarantors of $16,000,000 now they only guarantee $15,000,000. This must be admitted. But we do not follow the reasoning of objecting stockholders that this long time loan was in any sense a great advantage to the Kaiser interests but none to the Kaiser-Frazer Corporation. Anything may happen in the next ten years (including a world war that looms large on the horizon as this opinion is being written) and certainly if the Kaiser-Frazer automobiles are not sold there will be at least a $34,000,000

indebtedness (omitting the $10,000,000 revolving fund) to be paid off out of the dwindling assets of Kaiser-Frazer as well as $13,000,000 which Kaiser-Frazer must pay to the War Assets Administration for the Willow Run plant for which the government bureau is also given priority by the Kaisers through the guaranties at the RFC.

It doesn't take an economist, a certified public accountant or business relations advisor to figure out that it is better to be endorser on the note of a man who can pay with his own assets than to be endorser on the note of the same man who is rapidly putting himself in a position where, if his business is not a success, you'll have to pay at least part of his note.

A further condition of the RFC guaranties is that the Kaiser interests pledge $10,000,000 in collateral actually taken out of their assets. Of course certain restrictions existing in the previous agreement were removed and it may be that the change may prove to have been a good move on Kaiser's part but there can be no denying that these new guaranties place at least $10,000,000 of Kaiser assets in jeopardy.

Objecting stockholders also minimize the importance of the payment by Fleetwings to Kaiser-Frazer for the presses that Kaiser-Frazer originally purchased and left with Fleetwings to make certain parts of Kaiser-Frazer cars. Objecting stockholders say that Fleetwings had wanted to buy these assets right along because under the terms of the Metropolitan Life Insurance grant to it of $4,500,000 these presses were required as part of their assets.

The practice of corporations furnishing equipment and financing suppliers into business is not unusual. It may look foolish to do such things but when you are a manufacturer afflicted with the "can't get material" or "can't get equipment" or "can't get parts" disease you'll do almost anything to assure yourself a source of supply.

Kaiser-Frazer entered into this deal with Fleetwings. It paid the money for these presses, left them with Fleetwings to use. It may not have proven a profitable deal to Kaiser-Frazer but now Fleetwings finds that it needs some of this equipment to

carry out its contract with Sears-Roebuck. It has to have something it doesn't own. If it hadn't been for the interlocking directorate so condemned by objecting stockholders, chances are that the needs of Fleetwings might never have become known to Kaiser-Frazer. Anyway, Kaiser-Frazer directors were under fire in a lawsuit involving these presses and we believe that helped in boosting the price to Fleetwings.

If Fleetwings had gone bankrupt then the presses would be back in Kaiser-Frazer's yard but because Fleetwings isn't bankrupt and can use them almost $900,000 goes into the Kaiser-Frazer treasury. Objecting stockholders say this consideration doesn't amount to anything. This court says it does.

It must also be remembered that the Fleetwings deal was not completed until November 18 of last year after the first notice had gone out to the stockholders. In December 1949 Fleetwings paid Kaiser-Frazer $870,000 and although Fleetwings now owns these presses it is under agreement to Kaiser-Frazer to furnish certain parts if and when the occasion arises. This may become very important in the future.

Another argument used by objecting stockholders as to why this agreement should not be approved is that Permanente is paying the entire $500,000 and that all other defendants get off "scot free", citing Winkelman v. General Motors Corporation, supra, as authority.

For three reasons this objection is of no value.

First, we do not acquiesce in the reasoning that the $500,000 to be paid is the only consideration; second, those who signed the agreements did so as "individual defendants and corporate defendants"—and they agreed to see that the consideration was forthcoming; and, third, the case is not in point. We see no merit to this argument.

We come then to the final objection raised by the objecting stockholders—that part of this consideration had already been paid when the first notices went out to the stockholders which makes it a "fait ac-

compli" and cannot be accepted as consideration of an agreement "in futuro".

Here objecting stockholders forget recent history. They evidently do not remember that when it was announced that RFC was going to loan Kaiser-Frazer $44,400,000 a number of articles appeared in the public press indicating that a Congressional investigation to stop issuing of the loan was contemplated. This would have delayed matters. Objectors refuse to appreciate that this company was fighting for its life, and we anticipate that if the Kaiser interests had waited even until this day before giving these guaranties and before taking the risk that this court would not approve the settlement agreement some of these very stockholders would be suing the Kaisers on the theory that it was their duty to do the very thing which they now criticize them for doing. The Kaisers were caught between two fires and as soon as they knew the agreement was signed they quickly gave the guaranties and Kaiser-Frazer got the money from RFC. The Kaisers seemingly have great confidence in the future success of Kaiser-Frazer's product; a confidence, incidentally, that is evidently not shared by those who in this court profess to be acting solely on behalf of the best interests of the stockholders. While the Kaisers, in September 1949, were not in an enviably position so far as business reputation or pride might go if they had permitted the Kaiser-Frazer Corporation to sink they were probably not going to lose any money on their guaranties. Now, if Kaiser-Frazer fails they may lose all three—business reputation, pride and $15,000,000.

But we do not understand that the purpose of Rule 23(c) is properly construed by objecting stockholders as applying only to agreements that are entirely executory. As a matter of fact, we believe that those who were responsible for this rule had no such limitation in mind. But whether they did or did not, this Court is not going to lay down the rule that directors of corporations who may in the future be charged with breach of trust or fraud and who may be confronted with a situation that requires immediate action must not under any

circumstances do what they honestly believe to be the proper thing until the court has had an opportunity to determine whether the agreement of compromise they may have entered into is good or bad.

As stated in Illinois Pneumatic Gas Co. v. Berry, 113 U.S. 322, at page 327, 5 S.Ct. 525, at page 528: " * * * Complaints that its own directors exceeded their authority come with ill grace when the acts complained of alone preserved its existence."

■ To this court it is an accepted principle of law that we may sanction an act which we would have authorized in advance of its performance.

■ Furthermore, it has been the rule for years that if a settlement is worthy of approval it is immaterial whether some or all of the benefits may already have been conferred pursuant to the agreement. Goodwin v. Castleton, 19 Wash.2d 748, 144 P.2d 725, 150 A.L.R. 859; Ashley v. Keith Oil Corporation, D.C., 73 F.Supp. 37; Brendle v. Smith, D.C., 7 F.R.D. 119; Denicke v. Angle California Nat. Bank, 9 Cir., 141 F.2d 285.

Even an unauthorized act of the guardian ad litem may be later approved by the court. Metzner v. Newman, 224 Mich. 324, 194 N.W. 1008, 33 A.L.R. 98.

This court's position is unequivocal and we believe that if we were to consider it wrong for the Kaiser interests to have given the guaranties and thus saved this company, we would certainly be putting a premium on fear as against courage; and we would promote inequity instead of equity. We have no hesitancy in holding to the contrary.

### Conclusion on Consideration

It is our opinion that the consideration here is divided into three phases—all of which are good—the guaranties, the Fleetwings payment, and the $500,000 which add up to a formidable sum of money, and that we should not penalize those who, to aid this corporation, assumed the possibility of this court's nonapproval of the compromise settlement agreed upon.

### In Summary and Conclusion

In arriving at our final conclusion in this case after analysis of what we believe to be the important issues presented, we are convinced that because of the development of our economic system certain restrictions formerly surrounding transactions between interlocking directorates are no longer applicable. Our courts have narrowed the rule.

■ And as we have examined these questions we have come to the conclusion and hold that in none of the transactions has there been any fraud, collusion or attempt on the part of the so-called Kaiser interests to benefit at the expense of Kaiser-Frazer. On the contrary Henry Kaiser has time and time again, according to the undisputed facts, come to the rescue whenever the Kaiser-Frazer Corporation appeared to be headed for financial disaster. He began early by endorsing bank loans and rather than be condemned in the Permanente case, he and his family should be commended because they took a plunge into the aluminum business that might have proved fatal—partly to be of service to Kaiser-Frazer in the future. We believe his interest in Kaiser-Frazer is more than financial—at times it is almost paternal— and it's the paternalism that has gotten him into trouble. He wants Kaiser-Frazer to succeed. Everybody seemed satisfied to trust in Henry Kaiser until February 9, 1948 when the break came between the Kaiser interests and those of Otis & Co. No suit had been filed against these defendants until that day.

And there is this to be remembered. These suits were not started because these stockholders had just become aware of the several interlocking deals. The evidence shows that Otis & Co., the holder of the biggest block of stock in the suits pending, knew all about these transactions long before and acquiesced therein. It knew of the Graham-Paige and Permanente matters and yet it raised no objection. Other suits followed by objecting stockholders totalling 465 shares with some additional from one Milton Lacks who appeared at the hearings and whose position, sometimes for

—sometimes against—was uncertain until we received his brief. He now envisions the Kaiser-Frazer Corporation being unjustly enriched through the success of Permanente.

■ As stated in the above some of these actions might prove partially successful but in a much lesser amount than claimed. Still we hold that were all of these probable recoveries added together they are more than met by the consideration set forth in the agreement.

We hold that the $44,400,000 loan was of tremendous value to Kaiser-Frazer. It was the turning point from sure liquidation to a position that at least gives it a fighting chance to exist in a highly competitive business.

We further hold that if, in addition to the total damages we believe might be recovered, stockholders were also successful in the Permanente suit, it should be based on the worth and value of the letter of intent given Kaiser-Frazer as of March 1946 which amount would also be amply covered under our interpretation of the value of the consideration in the proposed agreement.

The stockholders of this corporation who favor the settlement agreement far outnumber those who are against it and while the motives of those who have brought stockholders' suits cannot be considered this court has no desire to promote the destruction of a corporation by contentious litigations which will cover a period of years, just so a few may experience tremendous satisfaction therefrom. By the time those suits would be terminated probably all chance of the successful survival of Kaiser-Frazer will have long passed by the board; even though the result be a sweeping victory for defendants, which this court believes would happen.

None of those objecting has shown a disposition to assume the burden that the Kaiser interests have undertaken and we anticipate that none of them will step forward in the near future.

■ For the reasons stated we hold that the settlement agreement is fair, equitable and for the best interests of all the stockholders. It has our approval, and an order in conformity with this opinion may be submitted for our signature.

## The Appendix

### Graham-Paige Transaction

One of the causes of action underlying the proposed settlement agreement involves Kaiser-Frazer's purchase in December, 1946 of Graham-Paige's automotive assets, including cash.

After formation of Kaiser-Frazer in August, 1945, Graham-Paige and Kaiser-Frazer entered into a joint operating arrangement, September 20, 1945 in which it was agreed that Kaiser-Frazer would lease the Willow Run plant from the government for their joint use in the proportion of two-thirds for Kaiser-Frazer and one-third for Graham-Paige. Kaiser-Frazer received its lease November 1, 1945. It was contemplated that Graham-Paige would finance one-third the cost of equipping the plant and pre-production expenses incident to getting into the automobile business.

The arrangement provided for in this Joint Operating Agreement did not prove satisfactory. As early as May of 1946, discussions were started between directors of both companies looking toward possible consolidation and Kaiser-Frazer postponed its plans to produce front wheel drive automobiles. It decided to manufacture the Frazer car with some changes and call it the "Kaiser Special"; entering into an agreement to that effect with Graham-Paige on June 21, 1946.

September 1946 commercial production of the Kaiser Special got under way, the new arrangement providing that Kaiser-Frazer was to reimburse Graham-Paige for two-thirds of the engineering development and special tooling costs; purchase all special tooling thereafter required, to be reimbursed in the amount of one-third thereof by Graham-Paige; purchase all Graham-Paige's automotive inventory and thereafter to assume the responsibility of buying all material and manufacturing supplies required for production. Graham-Paige agreed to reimburse Kaiser-Frazer for all expenses incurred by Kaiser-Frazer pursuant to production of the Frazer car and

by the end of the year 1946, 3,933 Frazers and 7,471 Kaisers had been produced.

Soon after the second agreement started it appeared that Graham-Paige might not be in a position to finance its share of the Willow Run production and by December this possibility had become definite. Merger of the two corporations was rejected as impracticable because of the variance between the relative market values of Kaiser-Frazer and Graham-Paige stock and their respective book values. Under these circumstances directors and representatives of their respective corporations undertook negotiations which resulted in an agreement whereby Kaiser-Frazer acquired all automotive assets of Graham-Paige, including its interests in machinery and equipment at the Willow Run plant, its inventories, trademarks, good will, and the like, $1,250,000 in working capital and $3,000,000 in cash, in consideration of Kaiser-Frazer assuming certain Graham-Paige liabilities, paying the principal and interest on $8,-524,000 of debentures, and transferring to Graham-Paige 750,000 shares of its common stock. In setting up this transaction on its books, Kaiser-Frazer entered the value of the 750,000 shares of stock issued as $4,875,000 or $6.50 a share. After deducting liabilities assumed, the net value of the tangible assets, consisting of machinery and equipment, cash and accounts receivable was entered on the books at $10,684,396 or $2,714,603 less than the consideration given as so calculated.

Of this transaction the objectors complain bitterly. They contend it was a fraudulent deal, formulated, discussed and consummated over a weekend, without adequate records, without verifications of dollar values; and without an appraisal of the physical assets; that Kaiser-Frazer paid $2,714,000 for intangible assets without any effort by its board of directors to determine the value, if any, thereof, and that Kaiser-Frazer transferred 750,000 shares of stock at $1.62½ less than the market and $3 below the book value, at a further cost to Kaiser-Frazer of $2,625,000 making the total overpayment to Graham-Paige the sum of $5,-339,000. They point out that Graham-Paige had no $3,000,000 cash to turn over to Kai-

ser-Frazer and that in order to get this sum it was necessary for Henry Kaiser and Joe Frazer to guarantee a bank loan to Graham-Paige for which the 750,000 shares of Kaiser-Frazer transferred to Graham-Paige was security with the right to vote this stock in the hands of Henry Kaiser and Joseph Frazer. They assert that as a result of this deal Henry J. Kaiser, without any expenditure on his part, secured voting control over an additional 9 per cent of Kaiser-Frazer stock, sufficient to insure his control of that company.

The record indicates that the plan was recommended to the Board of Kaiser-Frazer by Judge Samuel Roseman, Carl Owen and Arthur Ballantine, well-known and experienced lawyers, as well as George Bailey, Detroit partner of Ernst & Ernst, certified public accountants, who were intimately acquainted with the operation of Graham-Paige and Kaiser-Frazer and who, with the accounting firm of Haskins & Sells, had the responsibility of allocating costs under the joint operating agreement.

It is apparent that consummation of this plan was not a weekend affair. The facts clearly indicate that much discussion and negotiation was given to its formulation for several months prior thereto, that Bailey was well acquainted with the Graham-Paige finances, operations and the value of its property under the joint operating agreement. Further, practically all the fixed assets of Graham-Paige consisted of machinery and equipment in the Willow Run plant which had been purchased jointly with Kaiser-Frazer within one year of the date of the contract, making it possible for Kaiser-Frazer to have first-hand knowledge of the value of the assets received. It cannot be said that Kaiser-Frazer did not fairly evaluate the tangible assets which were transferred nor can it be said that the plan was formulated without full discussion and negotiation on the part of Kaiser-Frazer.

As to the intangibles the testimony was that this included (a) entire ownership and control of the automobile business theretofore operated on a joint basis with Graham-Paige; (b) entire benefit of the dealer organization theretofore jointly used by Kaiser-Frazer and Graham-Paige; (c) acquisi-

tion of the patents, trademarks and trade names of Graham-Paige including the name "Frazer", the Frazer car, and the good will and going concern value of Graham-Paige's automobile business; (d) acquisition of the Graham-Paige distributor organization; (e) elimination of the legal problems and troubles arising out of the joint operation; (f) avoidance of difficult legal questions in the event of any insolvency proceedings resulting in an operation of the Graham-Paige automobile business by a receiver; and (g) avoidance of the disastrous effect upon the business and credit of Kaiser-Frazer that a failure of Graham-Paige would necessarily entail. It also appears that Graham-Paige had spent over $8,000,000 for advertising, engineering, pre-production expenses and the like, which was not reflected in the tangible assets.

It is extremely difficult, if not impossible, to place a value on these intangibles. In the face of the assertions made by the objectors, it is our conclusion that these tangibles and intangibles were of sufficient value to Kaiser-Frazer that it was reasonable for the directors to assign that value to the assets which the consideration paid indicates, except possibly as reflected in the following:

In support of its position that overpayment was made by Kaiser-Frazer, the objectors point out that the value of $6.50 per share assigned to the 750,000 shares of stock would give Graham-Paige approximately 20 per cent of the future income of Kaiser-Frazer, and that it was approximately $1.62½ below the market price at that time. Although the value of the stock subsequently rose, we must examine this transaction as of the time it occurred. Justification for this figure is based on the cost to Kaiser-Frazer if this stock had been sold through underwriters, which cost might closely approximate $1.50 per share. Further justification is based on the fact that this figure was suggested by Bailey. We find it difficult to justify defendant directors' imposing an underwriting discount in the exchange of assets for stock between corporations having common directors. There seems to be no basis for comparison and the directors cannot excuse their actions by reliance on the opinion of Mr. Bailey.

Here there is some evidence that the directors failed to prove that the deal was fair and equitable. We appreciate the fact that Graham-Paige had Kaiser-Frazer in a hole and knew it. This was an indirect result of the initial agreement. We also realize that Kaiser-Frazer was anxious to cancel this undesirable contract; but the burden is upon proponents, and particularly defendant directors, to prove the fairness of the exchange. The position of Henry Kaiser in viewing the transaction not in terms of dollars and cents but in terms of transferring 15 per cent of stock for one-third productive capacity is at least open to question.

Very probably the claim of objecting stockholders on this part of the Graham-Paige deal might meet with considerable favor by the court and jury to which it would be presented.

As for Henry Kaiser's retention of some control over the hypothecated stock, we find nothing wrong. It is our opinion that if this had been put to a stockholders' vote it would have passed unanimously because Henry Kaiser was the one man whose participation in this new corporation was the magnet that drew millions from the investing public. They certainly would not have wanted control of their company to pass into other hands.

Objectors argue also that the Kaisers were motivated by a desire to strengthen their voting powers in Kaiser-Frazer by this Voting Trust. This is not entirely true. The effect of the Voting Trust was to maintain practically the same relative control between Graham-Paige and the Kaisers as had theretofore existed and it is absurd to contend that Kaiser would enter into this transaction merely for the purpose of strengthening his voting control. In fact there was no certainty of control even with the Voting Trust as Graham-Paige could withdraw the stock at any time by sale at public offering or dividending it to its stockholders. It also appears that the Voting Trust was required in order to secure the Graham-Paige loan from the

Bank of America. Furthermore we do not follow the reasoning of objecting stockholders that Henry Kaiser would profit financially from the new arrangement.

■ Nevertheless, looking at this entire transaction as one consummated by common directors, it is our belief that the stockholders would have a fair chance to recover some damages as a result of the undervaluation of the stock transferred, which damages would be limited by the effect on the market of throwing in 750,000 shares for sale at one time.

## Fleetwings

In the causes of action involving Kaiser-Frazer and Kaiser Fleetwings, Inc., another Kaiser owned corporation, it is alleged that great sums of money were used wrongfully by Kaiser-Frazer to equip the Fleetwings plant; that prices paid to Fleetwings for doors and deck-lids were excessive and exorbitant, and were paid by Kaiser-Frazer for Fleetwings' benefit but to the financial detriment of Kaiser-Frazer.

It is first alleged that Kaiser-Frazer expended $2,100,000 for experimental work in the manufacture of aluminum bodies for automobiles. Fleetwings was engaged to do the work on the basis of cost plus 6 per cent. However, the facts are that at Henry Kaiser's insistence the work was performed at cost and without profit. The result of this research was the determination that the manufacture of the entire body out of aluminum sheet was inadvisable. The desirability of making the experiment, the lack of profit to Fleetwings and the reasonableness of charges made for work done indicate this to have been a bona fide transaction.

The expenditures made for improvements, plant rearrangements and installation of presses at the plant of Fleetwings cannot be the subject of complaint. Kaiser-Frazer expended $924,173 for these costs but Fleetwings has repaid in full the entire expenditure made by Kaiser-Frazer. Kaiser-Frazer also expended $950,794 for presses. For a time these presses were leased at the prevailing rate of 12 per cent per annum of their costs. Pursuant to the agreement Fleetwings purchased these presses at their depreciated book value in the amount of $879,503.

At the commencement of its operations, Kaiser-Frazer's sole source of supply for doors and deck-lids was the Hayes Manufacturing Company. Kaiser-Frazer complained that the Hayes product was poor and its deliveries unreliable. Whether this was true or not, it was for Kaiser-Frazer's officials to decide. It was disputed whether Hayes was required to do the metal finishing, but the fact remains that Kaiser-Frazer did its own metal finishing. The alleged poor quality of Hayes product caused stoppages of production and increased costs due to mechanical and other defects which could not be corrected in metal finishing. Kaiser-Frazer was desirous of improving the quality of doors and lids, to eliminate the above increased costs and above all desired to protect itself against possible curtailment or stoppages of work resulting from having but one source of supply.

On March 3, 1947 Kaiser-Frazer contracted with Fleetwings for manufacture of deck-lids at cost plus 10 per cent. Hayes was left with the production of doors. A second contract dated October 1, 1947 provided for a fixed price of $8.75 per deck-lid, retroactive to July 1, 1947. On December 5, 1947 a new contract providing for the cost plus 10 per cent was reinstated. This change was due to the installation in the Fleetwings plant of presses and assembly lines which made it virtually impossible to estimate what the starting costs would be. On December 4, 1947 Hayes submitted a bid to manufacture deck-lids required by Kaiser-Frazer at $5.90 each. This bid was rejected. Fleetwings has continued to manufacture all Kaiser-Frazer deck-lids since December 5, 1947 on a cost plus 10 per cent basis. The objectors contend that Fleetwings should be required to return approximately $2.85 per deck-lid manufactured, or a total of $228,000 based on the manufacturing of 80,000 deck-lids.

■ Objectors fail to consider that Fleetwings did "metal finish" which eliminated certain expenditures by Kaiser-Frazer and accounted for part of the increase. A second weakness of the objectors' posi-

tion is that Kaiser-Frazer believed it was getting a better product. It is further to be noted that by July 27, 1948 the price of deck-lids to Kaiser-Frazer was averaging $7.50 which defendants insist was below the ultimate cost to them of the Hayes product. The complete evidence on the deck-lid arrangement indicates that it was materially beneficial to Kaiser-Frazer.

On December 5, 1947 Kaiser-Frazer executed an agreement with Fleetwings whereby it was to manufacture rear doors for Kaiser-Frazer automobiles. Under this contract Kaiser-Frazer agreed to install necessary presses. The reasons underlying this contract were the same as those applicable to the deck-lids contract. On December 4, 1947 Hayes wrote to Kasier-Frazer advising them that they would manufacture the doors for a total of $36.36 per set of four doors, the breakdown being $9.66 per front door and $8.52 per rear door. Budd Manufacturing Company contracted to furnish the front door at $12 per door. Fleetwings was to furnish doors at a price equal to cost plus 10 per cent. On October 31, 1948 Kaiser-Frazer entered into another contract with Fleetwings which provided that in the event Kaiser-Frazer obtained lower prices from competitors, Fleetwings would not get the business unless it met the reduced price. Furthermore the price could not be increased. If Fleetwings' costs exceeded its estimates, it would receive no more for the doors and deck-lids. In this case Fleetwings faced the possibility of manufacturing doors and deck-lids at a loss. One may ask why Fleetwings did not at the outset furnish the doors at a price comparable to Budd rather than at approximately $18 per door. However it is to be remembered that at this time the obtaining of such materials was nearly impossible. To insure itself of a supply, plus good quality materials, the transaction was reasonable, except for one item.

It is accepted that the starting price of doors would be greater under a cost plus 10 per cent provision than after a period of volume production. Fleetwings charged approximately $18 per door until October 25, 1949. The price is now $12 per door. Although the cost plus 10 per cent may be a fair price, one wonders why the price fell so suddenly on October 25, 1949. One becomes quite skeptical of such a sudden drop on the very day the compromise agreement was signed. A gradual decline would seem more appropriate.

 We recognize that when a business experiment is exploded the expounders of the theory that gave it birth do not loom up as industrial giants, but failures made with the best of intentions do not exact penalties from those responsible. Nevertheless there is some possibility that a court might construe the door part of the Fleetwings contract as detrimental to the interests of the corporation. Only a trial could accurately determine what, if anything, might be recovered but it would not affect the final outcome of this case.

## Manipulation and Stabilization

Liability of defendants in this action is predicated upon violations of Section 9(a) (2) of the Securities Exchange Act of 1934, 15 U.S.C.A. § 78i (a) (2), to-wit, breach of fiduciary duty and negligent waste of corporate assets in connection therewith.

Early in 1948 Kaiser-Frazer proposed to issue and sell to the public 1,500,000 shares of its common stock through three underwriters: Otis & Co., First California Company and Allen & Company.

The proposed issue was to obtain needed funds to expand production to 1500 cars a day, tooling, dies and forms for a new car and for plant additions and improvements. Previous to this time Kaiser-Frazer was indebted to Bank of America in the amount of $11,280,000 which loan was paid December 27, 1947, although not due until August 1, 1949.

The objectors contend: (a) that this payment was but a step in making the prospectus for the future 1,500,000 share issue appear more attractive; (b) that it weakened the financial structure of Kaiser-Frazer, acting as a ban on new purchases; (c) that they artificially boosted the price of Kaiser-Frazer stock by misleading statements to the press; and (d) that when Kaiser-Frazer expended approximately $2,600,-000 of the corporate funds under a plan to

stabilize the price of the stock on the day before its issue defendants violated the Securities Exchange Act and Regulations.

Originally it was the intention of Kaiser-Frazer directors to sell the new issue in January and on January 6, 1948 the necessary Registration Statement was filed with the Securities Exchange Commission. The effective date, under Securities Exchange Commission rules, would be 20 days later. The closing price of Kaiser-Frazer on the New York Curb, January 6, was 14½, but on January 24 it closed at 11¾. As a result, representatives of Kaiser-Frazer and the underwriters decided to postpone the offering. On February 2, 1948 it was agreed that the issue would be offered at the close of the market on February 3, provided Kaiser-Frazer stabilized the stock until the close of the New York Curb on that day; thereafter the underwriters would take over. The price to the public of the new issue would be ½ point below the closing price on February 3d. Objecting stockholders say that this was "stupid" and that the Kaisers should have known better. But if this is true, and the Kaisers who are not stockbrokers should have known better, how about their advisors, particularly Otis & Co? Even if "stupid"—it would not warrant recovery from the defendants. It is undisputed in this record that Cyrus Eaton of Otis & Co., was authorized to purchase 15,000 shares for Kaiser-Frazer to accomplish the stabilization; that he advised Kaiser-Frazer that stabilization could be accomplished by the purchase of not more than 25,000 shares; and that Mr. Eaton and others had insisted that stabilization was necessary to insure sale of the 1,500,000 shares.

However, the "news" that the public would be able to buy Kaiser-Frazer shares February 4th at 50 cents less than the market closed at February 3 leaked out and an avalanche of large and unexpected selling developed which caused the directors of Kaiser-Frazer to make a decision that very day between abandoning or continuing stabilization. It is not disputed that Mr. Eaton advised them to continue and as a result Kaiser-Frazer purchased 186,200 shares of its own stock at a price of $13.50

per share only to learn after the market closed that the underwriters had decided not to go through with their part of the deal.

This left Kaiser-Frazer in a very unenviable position but negotiations resulted in the underwriters agreeing to purchase 900,000 shares with a "best efforts" provision to sell the remaining 600,000 shares.

But again, on February 9, Otis & Co., and First California purported to terminate this contract and refused to go through with the new deal on the grounds that the suit filed that morning in Detroit by Masterson excused performance. Various proposals and offers to bail out or settle with Kaiser-Frazer were allegedly made by the underwriters but were rejected by Kaiser-Frazer. The suit now pending in the Federal Court of New York wherein Kaiser-Frazer seeks damages from Otis & Co. is based on the alleged failure to perform the above contracts.

The evidence, also not denied, indicates that the stabilization of the 1,500,000 issue was not entered into without consideration of its legality and feasibility. Advice of the Securities Exchange Commission was sought and Kaiser-Frazer was assured stabilization was legal if it began at a price uninfluenced by Kaiser-Frazer officials or the underwriters or anyone connected with them. It appears that the Securities Exchange Commission knew that the stock was to be stabilized at 13½ and offered at 13. Even objectors recognize the necessity and practice of stabilization in the distribution of securities. However, they contend that to stabilize at a manipulated price is illegal and in violation of Section 9(a) (2) of the Securities Exchange Act. And in the case at bar they allege there was such manipulation basing their accusation on the various statements made by Frazer to the press from time to time prior to the actual stabilization. These statements they contend were made to boost the price of Kaiser-Frazer stock to a point where it would be profitable to put the new issue on the market. There is no direct evidence that the statements allegedly made by Frazer were for that purpose or whether

these statements actually did cause the rise in price.

The burden of proof rests on the suing stockholders in this litigation. Possibly these statements were improper but in absence of proof, allegations that they were made for a certain illegal purpose cannot be assumed. It is not unusual for a business man to give as bright a picture of his business as is possible, and to express confidence in its future success. The buying public takes these statements with a grain of salt. Besides it was at most only Frazer's own opinion and he claimed he was misquoted. Anyone interested could read the prospectus and filed certificate and get an accurate view of Kaiser-Frazer's financial position. We find that there is no proof of manipulation and in the absence of manipulation the stabilization cannot be challenged. On the contrary the Securities Exchange Commission, whose duty it is to watch this sort of finance, is today evidently more concerned with the activities of others in connection with this Kaiser-Frazer stock sale than with these defendants. At least the Commission has not complained and it does not appear that objectors have any ground to do so.

Defendants' refusal to accept offers by the underwriters was not negligence. Trembert v. Mott, 271 Mich. 683, 261 N. W. 109; Jones v. Foster, 4 Cir., 70 F.2d 200; Fletcher Cyc. Corporations (1947 Ed.) Sec. 1039; Atherton v. Anderson, 6 Cir., 99 F.2d 883.

To accept the proposal in discharge of the liability of Otis & Co. for breach of the contract would be unthinkable. In the first place it does not appear that any definite offers were made; merely suggestions. Defendants should not be criticized for upholding their part of the contract, a contract which if properly carried out would have netted Kaiser-Frazer approximately $17,-220,000 in new capital.

Furthermore we can see nothing wrong in Kaiser-Frazer paying off the Bank of America loan. Its cash position at that time permitted it and certainly there can be no criticism of directors' clearing the deck for the greater financing they knew to be necessary.

We find absolutely no merit to this action from any angle—except as a smoke screen.

## Kaiser Steel Corporation

Kaiser Steel Corporation, another Kaiser company, owns and operates a plant at Fontana, California, which has facilities for the manufacture of ingot, slab, and certain finished steel products. It does not produce steel sheet, which is the principal steel product used in the manufacture of automobiles.

During the year 1946, and thereafter, a severe and unexpected shortage of steel developed. Kaiser-Frazer was unable to obtain steel from any of the established steel companies as all their steel had been allocated to prewar customers. Consequently Kaiser-Frazer purchased steel ingot and slab from Kaiser Steel to be converted into steel sheet. It is not disputed that steel was required by Kaiser-Frazer and that these purchases were made of necessity, purchases elsewhere being impossible unless on the black market. But it is contended by objectors that the prices charged Kaiser-Frazer were greatly in excess of the market.

The transactions complained of occurred through the period of 1946 to June 30, 1948. The objectors point out that during the fiscal year ending June 30, 1948 Kaiser Steel realized a profit of 22 per cent of sales price on items of steel sold to Kaiser-Frazer whereas on its total gross business it realized approximately 10 per cent. Specific instances of overcharging are cited by objectors including the "Consolidated Steel" transaction. Here Kaiser Steel agreed to ship to Consolidated Steel on the west coast 19,250 tons of plate which Bethlehem Steel was previously obligated to furnish. In return Bethlehem shipped the same amount of sheet to Kaiser-Frazer. Consolidated Steel paid only the Geneva Base Price which was lower than Kaiser Steel's published prices. Kaiser Steel exacted from Kaiser-Frazer a sum equal to the difference.

In defense of their actions, defendants state that the prices paid for all steel products purchased, with the exception of slab, were the established and published prices of Kaiser Steel. Kaiser Steel had no published price for slab as it refused to sell this product to any one but Kaiser-Frazer so the price of slabs was computed by deducting from the published price of plate the cost of converting slab into plate. To have proved what Kaiser-Frazer would have had to pay for steel elsewhere would have been a useless gesture, for it is apparent that Kaiser-Frazer had no other sources of steel and none was forthcoming. It is not illegal for one company to charge more for an item than does another company selling the identical thing. But here it appears that the prices charged Kaiser-Frazer were the same as those charged other purchasers of Kaiser Steel. The net profit on the slab was the same as it would have been if converted into plate for which Kaiser Steel had a ready market. So long as the prices charged Kaiser-Frazer were established prices and did not vary with the customers, the objectors may not complain. This justified Kaiser Steel in exacting a premium on the Consolidated Steel transaction.

The higher prices of Kaiser Steel cannot be attributed to Kaiser-Frazer being its principal market, for the sales during the fiscal year of 1948 to Kaiser-Frazer amount to only $5,547,915 of the total gross business of $75,000,000. It is to be noted that the defendants state Kaiser Steel's gross business to have been only $52,500,000. The difference in the percentages of net profits can be traced to the sale of different types of steel, with Kaiser-Frazer purchases being principally of steel products carrying higher margins of profit.

The operation by Kaiser Steel of the Kaiser-Frazer owned Ironton Blast Furnace for the right to purchase 25 per cent of the pig iron from the blast furnace at cost was not unreasonable when one considers that Kaiser Steel managed the blast furnace and furnished coal at cost.

■ The transactions with Kaiser Steel, in a manner, were extremely beneficial to Kaiser-Frazer although charged higher prices because Kaiser Steel could have gotten those prices elsewhere. These were days of a seller's market. On price Kaiser-Frazer received no advantage but we cannot say that the objecting stockholders' suit has merit just because of this. At least they got steel and steel was sorely needed.

### Kaiser Engineers

Kaiser Engineers, Inc., performed services directly for Kaiser-Frazer under (1) a per diem contract dated December 1, 1946; (2) the contract concerning Long Beach construction and installation work dated March 11, 1946; and (3) the contract dealing with the Struthers Steel plant which was owned by Kaiser-Frazer.

■ The objectors indicate that Kaiser-Frazer paid to Kaiser Engineers the sum of over $2,000,000 exclusive of the Struthers blast furnace contract. The figure is grossly exaggerated. The facts indicate that Kaiser Engineers received for services $27,350 under the Long Beach contract and $240,492 under the per diem contract and its net profit for three years services under the per diem contract was only $46,670. Further, it managed Struthers on the same basis as Portsmouth Steel had previously. The payment to Fleetwings was subsequently repaid. The rates charged were reasonable in relation to the services rendered and beneficial to Kaiser-Frazer. We do not subscribe to objectors' theory of law that Kaiser Engineers should have rendered this service gratis. We hold that it falls within that group of transactions between interlocking directorates where the challenged directors have the burden of proof and that they have met this burden.

### Long Beach

In the spring of 1946, Kaiser-Frazer leased from the War Assets Administrator the Douglas Aircraft Plant at Long Beach, California, to be used for the assembly of automobiles. The lease ran five years at $115,793 rental the first year, $173,690 the second year, and $231,586 for the remaining three years. It was believed by Kaiser-Frazer that a substantial freight savings,

as well as additional production, could be obtained by having an assembly plant on the west coast. Expenditures were made in connection with this plant but work was completely suspended in November 1946. In the spring of 1947 installation was resumed and continued until early 1948. Thereafter Long Beach remained on a stand-by basis until October 1949 when it was used as a small assembly plant, hitting a peak of 10 cars per day.

■ Although large sums were expended and losses incurred, at the time the lease was entered into it was reasonable to suppose that the venture would be beneficial to Kaiser-Frazer. Other automobile companies have such assembly plants and the anticipations which Kaiser-Frazer had of profiting in a like manner cannot be looked upon with disfavor at this time, although subsequent events prove that it was a mistake. Directors cannot be penalized for an error in business judgment which at the time appeared reasonable. The question of interlocking directorates is not involved.

### Rototiller

■ In order to absorb a portion of the Long Beach plant overhead charges, arrangement was later entered into whereby Kaiser-Frazer was to equip the plant and manufacture 30,000 Rototillers for Graham-Paige at cost plus 50 per cent of Graham-Paige profit. Expenditures were made to get ready for production, but the program was discontinued as a result of the decline in the demand for Rototillers. Graham-Paige paid Kaiser-Frazer the cost of tooling and inventory. Although losses may have occurred, there was every reason to believe that the action taken was in the best interest of Kaiser-Frazer. The directors cannot be penalized for taking such action.

### Muntz Franchise

A transaction where objectors allege profit to an insider at the expense of Kaiser-Frazer involves the granting of the New York area distributorship to Carl Muntz who at the time was a Kaiser-Frazer distributor in Los Angeles. It appears that Frazer was interested in Muntz obtaining this distributorship and offered his financial services to him through Joseph W. Frazer, Inc. Frazer owned 51 per cent of this corporation. Joseph W. Frazer, Inc., first subscribed for $50,000 of the Muntz stock, September 1946, and September 30, 1946 Kaiser-Frazer granted the distributorship to Muntz Car Company. Later the plan to subscribe stock was changed and Joseph W. Frazer, Inc., merely agreed to extend to Muntz a line of credit up to $50,000. In return Muntz agreed to repay the loan, if any, the interest, and for a two year period pay 50 per cent of the profits of Muntz Car Company to Joseph W. Frazer, Inc.

Muntz operated until December 22, 1947 without using any part of the $50,000 credit but about a year after the transaction was entered into a controversy arose between Muntz and Joseph W. Frazer, Inc. This controversy was settled by Joseph W. Frazer, Inc., receiving $85,000 which represented about 30 per cent of the profits made by Muntz in the one year operation, and purchase of Muntz' assets by Kaiser-Frazer at book value.

■ The defendants claim that the franchise agreement with Muntz was made by Graham-Paige and not by Kaiser-Frazer, that the matter was submitted to the Kaiser-Frazer board so there would be no question about the transaction, and that the dealership was taken over by Kaiser-Frazer as part of the automotive assets purchased from Graham-Paige, a statement that is not entirely accurate. It is also apparent that Frazer made a sizeable profit on a small investment and while that profit itself cannot be criticized unless the payment thereof could only be effectuated by purchase of the Muntz assets by Kaiser-Frazer one can easily arrive at the conclusion that the two deals were tied together. It does not appear that Kaiser-Frazer was damaged by the transaction nor was it deprived of any profit which it otherwise should have had, but there was unjust enrichment to Frazer as a result of the board's action and the stockholders' suit has at least an even chance of recovering part of Frazer's profits.

## Permanente Metals

We come to the last and most important of 'the transactions attacked in the stockholders' derivative suits—the Permanente deal.

We call this the most important only because it claims the largest amount of damages and freely state that if there is a probability of the stockholders recovering the near maximum of what they claim in the actions wherein the Permanente transaction is assailed, to-wit, forced assignment to Kaiser-Frazer of the Trentwood, Mead and Baton Rouge plants or even the Trentwood plant alone; or recover damages, in cash, or based on their idea of what a fair percentage of the Permanente stock should have been received by Kaiser-Frazer, then the consideration specified in the settlement agreement is not enough.

Objectors claim that there was fraud and self-dealing by Henry Kaiser and his associates on the Kaiser-Frazer board and that they transferred an assured profitable asset and corporate opportunity from Kaiser-Frazer to Permanente, to-wit, the Trentwood, Mead and Baton Rouge plants, for a grossly inadequate consideration.

Here are the facts:

After the war the government sought to dispose of the three plants in question, among others, to a financially responsible bidder and with the expressed intention of building up an integrated aluminum business, chiefly as competition for Alcoa. The RFC (and later WAA) was designated as disposal agent, with Sam Husbands, a director of RFC, primarily responsible for their sale or lease.

As early as February 21, 1945 Husbands had sought to solicit interest in the country's surplus aluminum plants, addressing a letter to 57 firms engaged in the manufacture of non-ferrous metals. Receiving little encouragement, Husbands, August 2, 1945 suggested a plan to the board for leasing three plants under an arrangement by which the government would stand all losses and share in the profits. The unknown peacetime market for aluminum, the large surplus of prime and scrap, and the competitive advantage of Alcoa apparently was a buga-

boo facing any group that might otherwise be interested. This was further reflected in a report submitted to Congress by the Attorney General of the United States on September 11, 1945 and reemphasized in a report to Congress by the Surplus Property Board, September 21, 1945. For many months no offer, aside from a rejected proposal by Reynolds Metal Co., was submitted on Trentwood or Mead.

In addition to the lack of rainbow complexion pictured in the above reports, many other hindrances existed which required removal before any real interest could be aroused in aluminum minded investors. The first was eliminated August 30, 1945 when the government terminated the wartime leases of aluminum plants held by Alcoa. That put Trentwood, Mead and Baton Rouge, among others, on the market. The second, when the Surplus Property Board's report became effective, November 21, 1945, for then the Board could legally dispose of the plants. The third, final and most important obstruction was removed January 10, 1946, when Alcoa granted to RFC free use of its alumina patents, with the right to extend sub-licenses to the lessees of government plants. Following this was the leasing of alumina plants to Reynolds on condition that Reynolds sell alumina to operators of government reduction plants. It was then, for the first time, possible for a bidder on surplus reduction plants to be assured of a supply of raw material.

With the above facts in mind, we turn to the additional happenings which throw light on whose "corporate opportunity" Trentwood really was, Permanente's or Kaiser-Frazer's.

█ Briefly, and in a general sense, the corporate opportunity doctrine, as applied to objectors' claim in this case, simply means that the fiduciary obligations of the Kaiser-Frazer directors did not permit them to divert a business opportunity, that had come to Kaiser-Frazer, from it to Permanente, a corporation having common directors with Kaiser-Frazer. Having done so, Kaiser-Frazer is entitled to recover the property with all profits. The penalty is not mis-

stated but there are many limitations and conditions to the general doctrine that will be noted as we unfold the remaining facts.

The Permanente Metals Corporation (herein referred to as Permanente) entered the light metal industry in 1940.

Kaiser-Frazer was not even a gleam in the eye.

In the fall of that same year Permanente constructed a magnesium plant from funds advanced by RFC and as early as 1941 Henry Kaiser, reportedly urged by Harold Ickes, Secretary of the Interior, prepared an estimate for an aluminum fabricating plant in the Bonneville area. But the recommendation of Mr. Ickes that Permanente be given construction and operation of the plant was rejected and the government aluminum expansion program turned over to Alcoa. That shut out everyone but Alcoa—until after the war.

With the passing of the Surplus Property Act of 1944, 50 U.S.C.A.Appendix, § 1611 et seq., and the end of hostilities, Henry Kaiser's interest was once again directed toward the aluminum industry. He wanted an integrated aluminum group for Permanente selected from the Oregon, Washington, and California government plants for aluminum ingot; the Arkansas and Baton Rouge, La. plants for alumina; and the Trentwood plant at Spokane for a rolling mill, with extrusion, forging and casting equipment at various locations.

October 2, 1944 Permanente requested Defense Plant Corporation to furnish a general plant layout drawing of Trentwood to determine whether that plant would be of value to it in contemplated future operations.

Permanente then employed Kaiser Engineers, Inc., to conduct a study "of the aluminum industry in the Pacific Northwest", which firm, August 20, 1945, selected George B. Scheer to do the work. Scheer completed and submitted his report to Permanente about January 15, 1946, and recommended against the company's venture into the aluminum industry.

In the meantime on August 22, 1945 Permanente's vice president, Chad Calhoun, testified before the Mead Committee (the Senate Special Committee Investigating the National Defense Program) outlining Permanente's interest in the aluminum industry and stating that Permanente contemplated a fully integrated business with Mead and Trentwood under one operation.

In August, 1945, Stuart Symington, Chairman of the Surplus Property Board and Sam Husbands of the RFC wired Permanente and 225 other firms to learn if they desired to purchase or lease any government owned aluminum or alumina plants. Only Permanente and Reynolds answered their query.

The Government officials throughout 1945 and the early part of 1946 were very pessimistic of promoting any new organization of sufficient strength to combat Alcoa. They had all suggested governmental backing and subsidies for anyone inclined to assume the burden and risk involved and so it continued until January 10, 1946 when Alcoa, holder of the basic patents for extracting alumina from bauxite released those patent rights to the RFC.

But none of these discouraging facts or others stopped the enthusiasm or faith of Henry Kaiser in the great possibilities for aluminum. Here is a list of the advisors that Henry Kaiser refused to follow on that product's future:

1. R. E. Knight, Chief Engineer of Permanente who did not "feel very optimistic";

2. The Attorney General of the United States who in his report added that its future was "an unknown quantity" and that no one "could engage Alcoa in unrestricted competition";

3. The skepticism of Reynolds;

4. The Bank of America's memo on the Browne report—Henry Kaiser's favorite survey;

5. The Surplus Property Board's report;

6. Husbands of the RFC;

7. Stuart Symington, Chairman of the Surplus Property Board, and,

8. The advice of his old business associates—L. S. Corey, President of the Utah Construction Company, Harvey Morrison

of Morrison-Knudson Company, and Felix Kahn of MacDonald & Kahn.

Henry Kaiser refused to be stampeded and kept Calhoun of Permanente continuously conferring with Husbands of the RFC for terms under which Mead and Trentwood could be leased. January 27, 1946, Calhoun reported those terms to Kaiser.

Now, although Kaiser-Frazer was incorporated August 9, 1945, its first public sale of stock was not until September, 1945, and its second issue January 23, 1946. And here defendants note that neither prospectus filed with the Securities Exchange Commission and made available to the public mentioned one word about Kaiser-Frazer being interested in any activity other than the making of automobiles. When however, Permanente was on the verge of completing its negotiations with the government as to both Trentwood and Mead, then it was (January 27, 1946) that Mr. Henry Kaiser suggested for the first time, that Kaiser-Frazer instead of Permanente be the corporation to submit such a proposal.

On the other hand while there was no evidence of any previous mention of Kaiser-Frazer going into the aluminum business there was evidence that from the time of Kaiser-Frazer's incorporation, Henry Kaiser had frequently expressed the desire to use aluminum bodies and frames in the production of automobiles, and on August 16, 1945, it was agreed that Rohr Aircraft Corporation be requested to submit a price and delivery date on 2500 aluminum body-frame combinations for the Kaiser car.

Also January 25, 1946, the Kaiser-Frazer board authorized the officers of the corporation to make necessary commitments and expenditures required to conduct and complete experimental work on three or four aluminum bodies for the Kaisers and the Frazers. But the evidence is equally conclusive that up to this time this was apparently the extent of even Henry Kaiser's desire to commit Kaiser-Frazer to participation in the aluminum industry.

Until January 26, 1946, any negotiating for Trentwood or Mead was done on behalf of Permanente with Kaiser-Frazer a possible customer and Permanente a reliable, friendly source of supply.

However, Henry Kaiser and his associates began to feel the effect of other trends. Use of aluminum was "experimental" but steel was an immediate "necessity" and in late January, 1946, Kaiser-Frazer ran into a shortage of sheet steel.

It was unable to obtain a single commitment. Steel companies were taking care of old customers with their limited supply and Kaiser-Frazer was faced with deferred production for an extended period, or the use of aluminum as a substitute. This was the final reason, according to the record, that resulted in Mr. Kaiser making the suggestion to Mr. Calhoun that reaction to a Kaiser-Frazer proposal on Trentwood might improve the possibility of Kaiser-Frazer procuring steel from established steel companies. As he put it himself, the public announcement would be a "leverage".

But Kaiser-Frazer had other entanglements. It was tied in with Graham-Paige and Joseph Frazer might easily become embarrassing, so on January 28, 1946 Kaiser informed Frazer (who was well aware that procurement of sheet metal was critical) that if Kaiser-Frazer could acquire both the aluminum sheet and "pig" plants, Kaiser-Frazer would be assured of getting some kind of metal for its cars. He then suggested to Frazer that Kaiser-Frazer bid on both Trentwood and Mead.

Mr. Frazer's reaction was discouraging.

He would have no part of the Mead plant and in that same conversation Calhoun objected to Kaiser-Frazer bidding on Trentwood alone but urged that a bid be made also on the Mead plant so as to comply with the government's desire to establish an integrated industry.

Henry Kaiser stood alone among the directors of Kaiser-Frazer in his desire to get both plants in Kaiser-Frazer's name so that as he claims, Kaiser-Frazer would be in a better trading position in its efforts to procure sheet steel.

Frazer was adamant against Mead.

On January 30, 1946 both Kaiser and Frazer sent Hickman Price and Stuart

Scott to Washington to present a formal written proposal to lease the Trentwood rolling mill for Kaiser-Frazer. This they did February 1, 1946. Many objections were voiced by Price and Scott and Frazer testified he went along with the hope that Kaiser-Frazer "might be able to get rid of the property (Trentwood) to one of Henry's other companies or elsewhere."

Price, a director of Kaiser-Frazer, had three objections: (1) Kaiser-Frazer's funds were barely sufficient for its automobile business; (2) the use of aluminum for mass production of automobiles had never been proved; and (3) the aluminum industry had been over expanded during the war so that there was no assurance that the venture would be profitable.

Scott, an attorney, also had three main objections: (1) Kaiser-Frazer had just completed its second public offering of stock under a prospectus which contained no indication "of any intention to engage in anything not directly related to the automobile business"; (2) the adoption so soon thereafter, of a distinctly new enterprise afforded room for the accusation that "there had not been a full disclosure of the pertinent facts at the time the issue went to the market"; and (3) that such a venture might subject the corporation and directors to stockholders' litigation.

It being well known that the government wanted a completely integrated aluminum operation, Calhoun had submitted his February 1, 1946 proposal on behalf of Kaiser Cargo, Inc. for the Mead plant. Both the Kaiser-Frazer (Trentwood) and Kaiser Cargo (Mead) proposals February 1, 1946 were apparently conditioned on a leasing basis but because of the objections of Frazer, Henry Kaiser's own attorneys and some of his own directors, Henry Kaiser did not insist that Kaiser-Frazer submit a bid on Mead, and Permanente did not bid on Mead because, as stated by Mr. Trefethen, he had been unable to clear with the Permanente directors any authority to bid on one plant alone.

February 21, 1946, War Assets announced its intent to lease Trentwood to Kaiser-Frazer and Mead to Kaiser Cargo. At the same time preliminary letters of intent,

dated February 19, 1946 were released outlining generally the terms on which the government was willing to negotiate. One witness described these preliminary letters as merely "hunting licenses".

A special meeting of the Board of Directors of Kaiser-Frazer then followed on March 12, 1946 at which time the leasing of Trentwood was discussed as well as the entering of Kaiser-Frazer into the aluminum field. Kaiser throughout the meeting continued to be optimistic about the future of the aluminum industry but he was unable to prevail upon Frazer or others to agree with him. The objections of Price and Scott, supra, were again raised and it was testified that because of these objections ratification and authorization was given to assign any and all Kaiser-Frazer interests in Trentwood to Permanente. At this time Kaiser-Frazer was in a favored position with the government but actually had nothing more than the so-called "hunting license".

The March 12 Kaiser-Frazer meeting was followed by a meeting of the directors of Permanente March 19, 1946 and Trefethen, a vice president and director of Permanente, was given the chore, by Henry Kaiser, of presenting to the directors and stockholders of Permanente the Browne report which was designed to persuade them of the advantages of Permanente entering the aluminum business by accepting the assignment of the letter of intent of Trentwood from Kaiser-Frazer. This prospectus reflected Henry Kaiser's optimistic views on aluminum and had been prepared by Donald E. Browne, an employee of Kaiser Services, Inc. It had been completed March 18, just the day before and was not completely available at the time Kaiser-Frazer directors took their action March 12, 1946.

The Browne report was based chiefly on the assumed operation of Trentwood at 100 per cent capacity when it would net $1,003,000 per month. At 60 per cent it would net $17,500 per month and at 40 per cent it would lose $315,000 per month. Kaiser stated and believed that Trentwood could operate at 100 per cent capacity whereas others doubted that it could even

operate at 40 per cent. Whether the report can be said to reflect optimism depends on which of the three possibilities you select. In any event it was interesting to note that when the question of taking over the Kaiser-Frazer letter of intent came to Permanente, three of its directors, Felix Kahn, Harvey Morrison, and L. S. Corey dissented. Objecting stockholders have made much of the Browne report because it never was officially presented to the Kaiser-Frazer board but later the above three old associates of Henry Kaiser decided to get out of Permanente and subsequently sold their stock to the corporation and stockholders. They allegedly took the position that it was a tremendous mistake for Permanente to enter the aluminum industry in competition with Alcoa. It was too hazardous an undertaking to risk their financial resources. Evidently the Browne report made no impression on them.

Permanente however, under Henry Kaiser, proceeded to arrange for financing the venture using the Browne report in negotiating its loan with the Bank of America.

But there the Browne report was rejected practically in toto because, as the bank said, it lacked a "survey of the industry and marketing". No credit agreement between Permanente and the Bank was finally executed until May 21, 1946 ($15,750,000 continuing line of credit expiring on May 31, 1949,) and the terms were extremely exacting.

Returning to Kaiser-Frazer's rights we are confronted by the fact that when Kaiser-Frazer decided not to get into the aluminum industry it had no direct commitment from the War Assets Corporation and did not receive such commitment until March 27, 1946 when letters of intent were issued on Trentwood to Kaiser-Frazer, and on Mead to Kaiser Cargo, these letters specifically providing for assignment of the leases to another corporation but only with prior written approval of War Assets Administration and the Attorney General of the United States. It was also stipulated that the leases could be initially executed in the names of such other corporations

and that in that event Kaiser-Frazer would be released from further liability. On April 9, 1946, War Assets Administration announced award of the Baton Rouge plant to Kaiser Cargo.

May 10, 1946 Kaiser-Frazer and Permanente executed an assignment of the Trentwood letter of intent by which Permanente agreed to enter into the lease with the government and assume all obligations of Kaiser-Frazer thereunder. As a further consideration—of no immediate value but of potential worth to Kaiser-Frazer—Permanente agreed to furnish all fabricated or semi-fabricated aluminum requirements of Kaiser-Frazer and its suppliers for its present or future manufacturing operations at Willow Run, Long Beach or elsewhere.

May 14, 1946 Permanente was approved as lessee and the directors of Kaiser-Frazer met on May 25 to ratify the action of May 10.

On August 16, 1946 a letter of intent was issued to Permanente covering Baton Rouge and the definitive leases covering the three plants were entered into as follows: The Trentwood lease as of July 1, 1946; the Mead, as of July 19, 1946; and the Baton Rouge, as of November 1, 1946. The consummation of these leases was the final step taken whereby Permanente acquired the three plants, and the United States government had finally won what it had been aiming at for years—an integrated aluminum setup to give Alcoa competition.

Permanente's integrated aluminum organization has been very, very profitable and the objecting stockholders now seek to acquire all three plants or at least Trentwood, or large damages. So we proceed to discuss the probability of the objecting stockholders being all or partially successful in this objective.

First, objectors claim that it was Kaiser-Frazer's strong financial position that resulted in the awarding of Trentwood to Kaiser-Frazer, citing that Kaiser-Frazer was not required to submit financial information or obtain financial guaranties as was required of Cargo.

The answer is obvious. It is not to be assumed that the government would have permitted the assignment and leasing to Permanente had Permanente's financial position been unsatisfactory. Permanente's financial position was not attained as a result of Kaiser-Frazer but through its own initiative. At the time of issuance of the original letter of intent, Permanente had made no attempt to qualify as lessee of the several plants for it was at this time that Henry Kaiser was trying desperately to interest Frazer and others in Trentwood. There was no need for Permanente arranging financial help until it became apparent that Henry Kaiser wasn't going to be able to interest the Kaiser-Frazer board in Trentwood much less in Mead and Baton Rouge; and Permanente stockholders proved not too eager to get into the aluminum business.

Objecting stockholders assert that Trentwood was Kaiser-Frazer's corporate opportunity and now insist that Kaiser-Frazer should get all three plants. They claim that everybody knew that there were large profits awaiting anyone who could get Trentwood.

As for this theory these facts are overwhelming:

1. That Kaiser-Frazer never had any rights in Mead or Baton Rouge at any time;

2. That Kaiser-Frazer never had the possibility of giving the government what it wanted—an integrated aluminum industry;

3. That Permanente had the first legal "corporate opportunity" to get each and all three plants;

4. That Permanente was in the field for Trentwood four years before Kaiser-Frazer was born;

5. That Kaiser-Frazer's most powerful stockholder, Henry Kaiser, worked to take Trentwood away from Permanente and give it to Kaiser-Frazer although he had started out only interested in Trentwood as a source of supply for Kaiser-Frazer;

6. That three of Permanente's largest stockholders refused to go along with Henry Kaiser on Permanente's leasing of Trentwood. The letter of intent represented no corporate opportunity to them.

7. That Kaiser-Frazer's directors, other than Henry and possibly Edgar Kaiser, didn't want Trentwood.

8. That only Henry Kaiser's complete control over Permanente compelled Permanente to accept the letter of intent with misgivings;

9. That Trentwood, alone, presented no "corporate opportunity" for Kaiser-Frazer; and

10. That the Trentwood letter of intent was of doubtful value—even a possible liability.

We believe and hold that the "corporate opportunity" was Permanente's—not Kaiser-Frazer's. Turner v. American Metal Co., 268 App.Div. 239, 50 N.Y.S.2d 800, 809; Lancaster Loose-leaf Tobacco Co. v. Robinson, 199 Ky. 313, 250 S.W. 997; Solimine v. Hollander, 128 N.J.Eq. 228, 16 A. 2d 203; Thilco Timber Co. v. Sawyer, 236 Mich. 401, 210 N.W. 204.

The objectors also complain that there was a lack of good faith in the disposal of the Trentwood mill. This the facts belie and it is unnecessary to repeat here in detail the enthusiasm of Henry Kaiser for the aluminum industry throughout and the lack of confidence on the part of his associates and advisors. All available reports concerning the aluminum industry and the competitive position of Alcoa made entrance into that industry appear to be very risky and possibly very disastrous, to almost everyone but Henry Kaiser.

Objectors' contention that no consideration was given for Trentwood is not sound, when one considers the policy and law of the Surplus Property Act prohibiting speculation, plus the lack of market for such plants and the fact that public policy required an integrated aluminum group that Kaiser-Frazer couldn't give. It appears that some Kaiser-Frazer directors believed they were holding a hot potato and were desirous of getting rid of it before being burned. Their interest was to obtain aluminum for automobile production and not to enter the aluminum industry. Being relieved of all liability and assured a supply of aluminum by Permanente they were re-

ceiving all they were interested in without further danger or possible criticism.

Furthermore, we hold that there was no failure to disclose valuable information on the part of either Henry Kaiser or the Kaiser interests to the other Kaiser-Frazer directors. If the Browne report relied upon by objecting stockholders had been presented to the Kaiser-Frazer board of directors it would have been just another opinion, but the Browne report in our estimation could not have matched the enthusiasm of Henry Kaiser for the future of aluminum and that "enthusiasm" was always before the Kaiser-Frazer board. What has happened since has proven that Henry Kaiser was right and that the Browne report reached the proper conclusion. What happened later also proved that others of the highest integrity and business acumen were wrong including the three associates of Henry Kaiser heretofore mentioned who refused to go along with Henry Kaiser's viewpoint and sold out their interests in Permanente. These men held 30 per cent of Permanente stock. Men of vision, men of ability, business men who had proven their merit. These were the men who couldn't see the advantage of Permanente going into the aluminum business and wanted no part of it.

It is also our conclusion that the so-called testimony of Chandler is of no moment. In fact Chandler's testimony was not really on the value of the letter of intent that Kaiser-Frazer had in 1946. He was trying to fit his deductions as to the worth of that letter of intent to the known value of Permanente stock in 1950—or four years later. In order to convince the court that the settlement was unfair he tried to build up the "slice" of the present Permanente plants that objecting stockholders might get. In this he reached astronomical figures. He refused to put a "then" (1946) value on the letter of intent obviously because it would have destroyed his efficacy as a witness. Mr. Chandler left this Court with the impression that if Kaiser-Frazer had exchanged its letter of intent on Trentwood for part of the Permanente stock in 1946 and this had later developed into a liability

for Kaiser-Frazer, he could easily have changed his deductions and conclusions. Mr. Chandler's expenses as a witness were admittedly paid by Otis & Co. and his testimony did not ring true.

We come to the probable legal objections of Kaiser-Frazer entering the aluminum industry. We believe this to be the most important because it is the opinion of this court that after men represent to the buying public that they are going into the automobile business and sell over $50,-000,000 worth of stock for that purpose, and then, before they have built a single automobile, attempt to divert those millions into the aluminum business pitted against one of the strongest corporations in existence, the Aluminum Company of America, that even without any provision or regulation of the Securities Exchange Commission or the Securities Exchange Act almost any court, if appealed to by its stockholders, would have prevented such action by injunction. Collings v. Allen, 90 N.J.L. 5, 100 A. 170; Rumery v. Standard Seed Tester Co., 194 Iowa 325, 189 N.W. 667; Pike v. Bangor & C. Shore Line R. R. Co., 68 Me. 445; Tams v. Abrams Ramos & Co., 120 N.J.Eq. 253, 185 A. 521.

The public knew that anything on wheels having a motor that would run could be sold. The cheapest "used cars" were bringing prices formerly paid for new Cadillacs, Lincolns or Chryslers. Almost every man, woman and child in America knew there was an automobile shortage and would be for at least two or three years.

Henry Kaiser told them he was going into the automobile business and he gave them a chance to go along. They knew that they were engaging in a highly competitive business; that they were up against Ford, Chrysler, General Motors and others; that comparatively few independents had survived that competition in its 50 years of life; but they also knew that in this particular industry there was a chance. Some of the others had lived—and made money. Without question they thought that under Henry Kaiser they could win. To many of them this man Kaiser could do the impossible. But to cope with something that

same public knew little or nothing about —aluminum—no. Many would have appeared to challenge, and we believe successfully, any such diversion of funds.

Furthermore under the Securities Act of 1933, 15 U.S.C.A. § 77a et seq., Kaiser-Frazer having filed its prospectus and registration statement could not use that money to go into the aluminum business. Securities Exchange Commission v. Foundation Plan, D.C., 31 F.Supp. 331; Deckert v. Independence Shares Corporation, D.C., 27 F.Supp. 763; Murphy v. Cady, D.C., 30 F.Supp. 466.

We further believe that the Securities Exchange Commission could have, probably would have—at the request of any investor —prevented Kaiser-Frazer's directors from using these moneys for a business foreign to representations made in the prospectus and registration statement.

In conclusion may we add this observation: We are not naive enough to believe that if Henry Kaiser had insisted he might not have committed Kaiser-Frazer to acquire the Trentwood plant.

But—Henry Kaiser would have been risking more than he gained and more than a much less astute business man would have voluntarily assumed. Henry Kaiser has proven himself to be a shrewd business man. And when confronted by the opposition of those whom he knew would oppose him only in an extreme case, Henry Kaiser did what appears to this court to have been the only sensible and fair thing to do. He assumed the uncertainties of the aluminum future by one of his own companies, at the same time agreeing that if and when aluminum was used in the making of automobiles— Kaiser-Frazer had an assured source.

Permanente was and is successful. These objecting stockholders should not now "cash in" on that success.

We believe defendants have proven that as directors they acted in good faith throughout, and were doing that which they felt was in the best interests of the Kaiser-Frazer Corporation. Looking at the transaction at the time of the occurrence, one cannot say that they exercised bad judg-

ment and it is our belief that this transaction would not be set aside by any court or jury. We find absolutely no merit to objecting stockholders' contentions in the Permanente suit.